**AMORY COTTON OIL COMPANY, a Corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. EC 69–31–S.

United States District Court, N. D. Mississippi, E. D.

Dec. 23, 1970.

Charles L. Brocato and J. Kearney Dossett, of Dossett, Magruder & Montgomery, Jackson, Miss., Fred B. Smith, Ripley, Miss., for plaintiff.

Johnnie M. Walters, Asst. Atty. Gen., Myron C. Baum, John F. Murray and Jack D. Warren, Attys., Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for defendant.

## MEMORANDUM OPINION

ORMA R. SMITH, District Judge.

This action has been tried to the court and is submitted upon the record, the evidence adduced at the trial, the briefs of the parties and oral argument of counsel.

The court will briefly summarize the issues before undertaking to set forth detailed findings of fact and conclusions of law which will govern the decision of the court.

Plaintiff, a Mississippi corporation, was chartered March 30, 1927 with an authorized capital of $30,000, consisting of 300 shares of common stock of the par value of $100.00 per share. No other class of stock was authorized by its charter.

In 1929 the charter of incorporation was amended to authorize the issuance of 150 shares of 8 per cent cumulative and participating preferred stock, and during that year 135 shares were issued at their par value of $100.00 per share. The remaining fifteen shares were never issued. The 135 shares which were issued were retired at par and cancelled on December 31, 1946 and February 1, 1947.

The first common stock issued consisted of 75 shares to L. E. Puckett, 75 shares to C. M. Harrison, and 50 shares to C. V. Mathews. These shares were issued on April 27, 1927. Later that year, on September 30, 1927, 70 additional shares were issued to L. E. Puckett and 30 shares to C. M. Harrison.

An analysis of notes payable and earned surplus of plaintiff, attached to the pre-trial order, reflects that the corporation suffered an operating loss in nine of the first sixteen years of its existence. Beginning with a deficit in its earned surplus account at the end of the first year, June 30, 1928 of $10,196.94, the deficit grew steadily until at the close of the fiscal year ending June 30, 1946 the deficit stood at $46,362.35. Thereafter until the close of the fiscal year ending June 30, 1958, during which period the corporation suffered three loss years, the earned surplus account increased in value to a surplus of $87,954.-93. At that time the corporation elected to qualify for Subchapter S treatment under the Internal Revenue Code.[1] The earned surplus account remained the same since that time through plaintiff's fiscal year involved in this action.[2]

The analysis mentioned reflects that L. E. Puckett, prior to his death in 1928, and thereafter his estate, made certain loans to the corporation. Advances of $6,000 during 1927, were repaid by January 4, 1928. Advances during 1928 amounted to $32,000, and were retired in full by December 19, 1929. Advances in 1931, amounting to $10,000 were repaid by August 29, 1932. Advances of $11,-500 in 1932, and of $2,000 in 1934 were repaid in full by June 30, 1934. During the latter part of 1934, 1935, and the first part of 1936, advances were made aggregating the sum of $38,200. Plaintiff paid $21,000 on these advances in April and June of 1936, and during the balance of that year and in 1937, and 1939, additional advances aggregating $35,785.25 were made. Plaintiff paid $31,910 on June 30, 1940, on the money advanced to it. During 1941, 1942 and 1943 advances were made aggregating the sum of $60,978.70. On January 10, 1944, plaintiff paid on these advances the sum of $7,500. An advance of $15,-000 was made in 1945, and on February 1, 1947 plaintiff paid the sum of $1,946.-

---

1. 26 U.S.C.A. §§ 1371–1378.

2. Fiscal years ending June 30, 1962, June 30, 1963 and June 30, 1964.

43. Plaintiff has not paid any further amount against these advances, and subsequently advances have been made as follows: $40,000 on December 30, 1949, $15,000 on June 30, 1957, and $10,000 on August 13, 1960. Interest on the advances by L. E. Puckett and/or his estate has been paid by plaintiff regularly since 1937. As of August 30, 1960 the indebtedness on advances made by Mr. Puckett or his estate amounted to $152,607.52. This amount remained the same and existed during the fiscal years here in controversy.

Starting in 1938 E. L. Puckett began making advances by way of loans to plaintiff so that on June 30, 1948 he had advanced plaintiff the sum of $89,608.-37, of which $24,600 had been repaid leaving a balance due at that time of $65,008.37. From July 1, 1949 to June 30, 1964 Mr. Puckett loaned plaintiff an additional $19,000. Plaintiff has not repaid any of this amount. The interest on all advances has been paid regularly by plaintiff. On July 1, 1961, Mr. Puckett transferred to his daughters, Mrs. Anna P. Solomon and Elnor P. Williams, $30,000 each of plaintiff's indebtedness to him. The net result was that plaintiff then owed Mr. Puckett $24,008.37 and each of his daughters $30,000, or a total of $84,008.37. This indebtedness remained constant and existed during the fiscal years involved in this action.

The entire common stock of plaintiff, with the exception of ten qualifying shares, five owned by W. L. Holland and five by E. V. Jones, came into the hands of the Puckett family, and during the years here in question E. L. Puckett owned 190 shares and Mrs. E. L. Puckett owned 100 shares.

None of the other stockholders, at any time, made advances to the corporation. However, beginning in the late forties plaintiff began to make substantial seasonal borrowings from the Union Planters National Bank, Memphis, Tennessee. In order to secure a line of credit for the corporation from the bank, E. L. Puckett, Mrs. L. E. Puckett, Mrs. Williams and Mrs. Solomon agreed with the bank that they would not withdraw or collect from plaintiff any part of the indebtedness due them by plaintiff until any and all indebtedness to the bank had been paid. In addition the parties transferred and assigned the notes held by them to the bank, as additional security for plaintiff's obligation to the bank.

The indebtedness created by the advances above mentioned was at all times evidenced by negotiable promissory notes executed by plaintiff, payable to party making the advance, or bearer, due on demand and bearing the legal rate of interest in Mississippi, i. e., six percent. In issuing the notes plaintiff used a note form in common use by lenders in the community. Each note contained all provisions necessary to adequately protect the holder of the note. The indebtedness represented by the notes were carried on plaintiff's books as current liabilities.

On November 25, 1958, plaintiff filed with the District Director of Internal Revenue, Jackson, Mississippi, an election to be taxed as a "small business corporation" under Subchapter S of the Internal Revenue Code, supra. Since that time plaintiff has proceeded to file the proper return of income with the District Director.

An agent of the Internal Revenue Service in 1961 audited plaintiff's return of income for the fiscal years ending June 30, 1959, and June 30, 1960, and did not question the status of plaintiff as a "small business corporation".

Agents of the Commissioner audited the returns of plaintiff for the fiscal years ending June 30, 1962, June 30, 1963 and June 30, 1964. The Commissioner determined that the advances made to plaintiff during the years in question by its stockholders did not represent true loans, but constituted contributions to the capital of the corporation. It is well to note here that L. E. Puckett, the first president of plaintiff, died November 28, 1928, and his stock in the corporation was bequeathed to his wife, Mrs. L. E. Puckett. Mr. Puckett's son,

E. L. Puckett, ascended to the presidency in 1929. The only stockholders making advances to plaintiff during the years in question were Mrs. L. E. Puckett and L. E. Puckett. The other stockholders, W. L. Holland and L. V. Jones, did not make advances to plaintiff. Mrs. Solomon and Mrs. Williams, each holding plaintiff's note for $30,000, were not stockholders during this period.

The Commissioner contends that the advances made by the stockholders during the period in question, being contributions to capital, constituted a second class of stock, thereby disqualifying plaintiff for treatment as a "small business corporation" for federal tax purposes.

Thus, the main issues for the court's decision are (1) whether the advances constituted contributions to plaintiff's capital, and, if so, (2) did they constitute a second class of stock. If the court decides the advances did not constitute contributions to capital, but, were, in fact, true loans, plaintiff must prevail. The plaintiff will also prevail if the court finds, that, while the advances were not true loans but contributions to capital, such advances did not, in fact, constitute a second class of stock. For defendant to prevail the court must decide both issues in its favor.

■■ There are several well recognized principles of law which are pertinent to a decision on the issues presented to the court. Initially, it must be recognized that the burden is on plaintiff to convince the court that the Commissioner's determinations are not correct. Broadhead v. Commissioner of Internal Revenue, 5 Cir. 1958, 254 F.2d 169, 170; Berkowitz v. United States, 5 Cir. 1969, 411 F.2d 818, 820. The issue whether the advances were, in fact, true loans and not, as the Commissioner contends, capital contribu-

tions or equity capital, must be decided on the unique fact situation shown to exist in the case under consideration. No single test is controlling or decisive in making this determination. Berkowitz v. United States, supra;[3] Harlan, et al. v. United States, 5 Cir. 1969, 409 F.2d 904; Tomlinson v. 1661 Corporation, 5 Cir. 1967, 377 F.2d 291; United States v. Henderson, 5 Cir. 1967, 375 F.2d 36.

The defendant's contention that the Commissioner's determination that the advances were, in fact, contributions to capital, rather than true loans, is supported by at least four cases decided by the United States Court of Appeals, Fifth Circuit. These cases are Montclair, Inc. v. Commissioner, 5 Cir. 1963, 318 F.2d 38; Berkowitz v. United States, supra; Tyler v. Tomlinson, 5 Cir. 1969, 414 F.2d 844; Brennan v. O'Donnell, 5 Cir. 1970, 426 F.2d 218.

*Montclair, Berkowitz* and *Tyler* involve the issue whether deductions claimed as interest by the taxpayer corporation were, in fact, dividends on risk capital. *Montclair* originated in the tax court. *Berkowitz* and *Tyler* originated in the district court. *Brennan* involves an issue similar to the issue involved in this case, and originated in the district court.

In *Tyler*, Judge Goldberg, speaking for the court, after making the observation that no simple test for the resolution of debt—equity questions has ever emerged, said:

"* * * Instead there have evolved 'at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness.' (citation omitted) These factors have been enumerated with some specificity as follows:

'(1) the names given to the certificates evidencing the indebtedness;

---

3. In Berkowitz, at 820, Judge Dyer, speaking for the court said:
    "Although there is a plethora of precedent on the question of whether advances by stockholders to closely held corpora-

tions are to be considered as debts or contributions to capital, each case must be decided on its unique fact situation, and no single test is controlling or decisive in making this determination."

(2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions.' (citation omitted)

To this already comprehensive list other courts have added such criteria as: 1) the extent to which the initial advances were used to acquire capital assets (citation omitted), and 2) the failure of the debtor to pay on the due date or to seek a postponement (citation omitted). Undoubtedly a further search of the cases would reveal yet other considerations that would add additional inquiries to this baker's dozen, but such a search would be a labor of supererogation. The object of the inquiry is not to count factors, but to evaluate them. No single factor can be controlling. (citation omitted) As we have said elsewhere in situations requiring the quest for a solution among myriad criteria: 'We think that the tests are, at most, helpful factors to be considered, and not fiats to be bound by. We disapprove of rubricating such "tests" into talismans of magical power.' " (414 F.2d at 847–848.)

*Berkowitz* and *Montclair* support the holding in *Tyler*.

The facts in the case sub judice are for the most part, uncontradicted. Applying the formula set forth in *Tyler* to the facts in the case sub judice, we find the results as follows:

1) NAME. The instruments evidencing the indebtedness are in form and substance negotiable promissory notes.

2) MATURITY DATE. The notes are payable on demand.

3) SOURCE OF PAYMENT. Payment is to be paid from the corporate funds, not necessarily earnings and profits.

4) RIGHT TO ENFORCE PAYMENT. With the exception to be noted, each holder of a note has the right to demand payment, mature the note, and enforce payment on default by plaintiff. The holders could not, however, demand payment and enforce payment, as long as plaintiff was indebted to the bank.

5) PARTICIPATION IN MANAGEMENT. The holders of the notes, as such, have no right to participate in management.

6) RELATIONSHIP TO GENERAL CREDITORS. Subject to their subrogation agreement with the bank, the holders of the notes held positions equal to those of general creditors.

7) INTENT OF PARTIES. The provisions of the notes show the parties intended to create an unconditional and legally enforceable obligation for the payment of the money.

8) "THIN" OR ADEQUATE CAPITALIZATION. The ratio of debt to capital was not excessive. Plaintiff's common stock was $30,000. The earned surplus account during the period involved remained constant at $87,954.93. The capital structure, therefore, amounted to $117,954.93. The indebtedness due on the notes aggregated the sum of $236,615.89. The ratio of the notes to capital account was approximately two to one. Plaintiff's notes payable account, representing notes payable to all parties, did not change materially from the close of the fiscal year 1962 to the close of the fiscal year 1963. The aggregate amounts owing by plaintiff on its notes payable at the close of the fiscal years 1962 and 1963 were June 30, 1962, $326,615.89, and June 30, 1963, $386,615.89: It is to be noted that the ratio of plaintiff's indebtedness in notes payable to capital accounts was approximately three to one.

9) IDENTITY BETWEEN CREDITOR AND STOCKHOLDER. Mrs. Sol-

omon and Mrs. Williams were not stockholders. E. L. Puckett, who owned 190 shares of the common stock, held plaintiff's note for $24,008.37. Mrs. L. E. Puckett, who held 100 shares of the common stock, held plaintiff's note for $152,607.52.

10) SOURCE OF INTEREST PAYMENT. Interest was payable out of general corporate funds with no obligation to pay the same out of dividend money.

11) ABILITY OF CORPORATION TO OBTAIN LOANS ELSEWHERE. The corporation was unable to make adequate loans from outside sources, except with the aid and assistance of the stockholders and Mrs. Williams and Mrs. Solomon.

As Judge Goldberg stated in *Tyler,* supra:

"* * * Decisions must be based on a wide variety of considerations, including the financial viability of a corporation, the manner in which corporate debts are created and shareholders equities distributed, the financial source from which corporate repayment is to be anticipated, the identity of interest between shareholder and creditor, and whatever else appears relevant." [4]

Judge Jones said in *Montclair*:

"* * * This Circuit has rejected the notion that thin capitalization alone will justify the Commissioner in designating an indebtedness as capital, but recognizes that this factor need not be ignored in determining whether all of the facts authorize the inference of an intent to make a contribution to capital. (citation omitted). Evidence which may tend to prove that a transaction was a contribution to capital may be of many sorts. (citation omitted). No comprehensive rule can be stated which will be applicable in all cases." [5]

The court must consider the factors in this case from a realistic viewpoint in reaching a decision as to whether the advances were true loans or contributions to capital. Plaintiff's balance sheet at the end of the fiscal years 1962 and 1963 reflects notes payable to stockholders in the sum of $236,615.89. At the end of the fiscal year 1962 notes payable to the bank amounted to $40,-000. During the year the indebtedness to the bank ran as high as $330,000. During the fiscal year 1963 the indebtedness to the bank ran as high as $740,000. The amount due at the end of the year amounted to $105,000. During the year 1964, the bank's loan ran as high as $1,005,000. The amount of the indebtedness at the end of the year amounted to $575,000. The practical effect of the shareholders' subordination of their right to collect their notes from plaintiff was to yield priority of payment to all creditors of plaintiff.

The stockholders have permitted their money to remain with plaintiff, with no payment on principal, since 1947, a period of fifteen years. Subsequent to 1947, the stockholders have made additional advances. The facts in the case lead the court to the conclusion that plaintiff could not have continued its existence except for the advances made by the shareholders. A demand for payment by the stockholders would have been disastrous to the business. Plaintiff did not create a sinking fund, establish a reserve, or adopt any other plan for the orderly retirement of the stockholder debt.

The court, therefore, concludes that the advances made by plaintiff by the shareholders were, in fact, contributions to capital, and were not true loans.

The court must now determine whether the contributions to capital, constituted a second class of stock, thus disqualifying plaintiff for treatment as a "small business corporation" for federal tax purposes.

The original regulation of the Treasury Department which was adopted De-

---

4. 414 F.2d at 847.

5. 318 F.2d at 40.

cember 18, 1956,[6] provided in its material part, "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock".

During the effective period of the regulation of the Tax Court decided the case of W. C. Gamman and Harriett Gamman, et al. v. Commissioner, 1966, 46 TC No. 1 CCH Tax Court Reporter, 1966 Regular Decisions, pages 2208, et seq. The court held that the portion of the regulation, aforesaid, was invalid. The question presented to the court in the case was whether certain loans made to the closely held corporation by its shareholders were contributions to capital and, therefore, constituted a second class of stock. The advances made by the stockholders were in direct proportion to their holding of stock. The Commissioner contended that the promissory notes issued to the stockholders in return for their advances to the corporation actually constituted a 6 percent preferred non-voting stock—a second class of stock. The Commissioner bottomed his case on the language of the regulation above mentioned. The court agreed with the Commissioner's contention that he was authorized to prescribe needful rules and regulations for the enforcement of the tax laws and that such regulations, insofar as consistent with expressed statutory provisions, have the force and effect of law. Maryland Casualty Co. v. United States, 1920, 251 U. S. 342, 40 S.Ct. 155, 64 L.Ed. 297. After reviewing the legislative history of the Subchapter S (26 U.S.C.A. §§ 1371–1378) the court said:

"* * * Consequently, we think the last sentence of the regulation, if given the connotation argued by respondent in this case, is too broad and places a restriction on the stockholders of electing corporations which was not intended by Congress. Congress obviously anticipated that stockholders of electing corporations could advance funds to corporations in the form of loans without disqualifying the corporation for subchapter S status, because it specifically made provision in section 1376 for adjustment of a shareholders basis in any indebtedness owing him by the electing corporation for operating losses of the corporation made available to the shareholder as a deduction. But under the regulation, applied as it is by respondent in this case, if the note or evidence of indebtedness is 'actually stock,' the corporation is automatically disqualified under subchapter S regardless of the terms of the note or the practical effect thereof. We think this is tantamount to an extension or modification of the law and goes beyond the Commissioner's powers. Where a regulation is an amendment or modification of the statute and therefore beyond the power of the Commissioner to make, courts must refrain from giving it effect. Louisville Gas and Electric Co. v. United States [60–1 USTC P. 9228], 148 Ct. Cl. 671 (1960). We think such is the situation here." [7]

After the decision in *Gamman* the Commissioner amended the regulation to meet the Tax Court's objection. The amended regulation, in its material part, provides:

"* * * *Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock.* However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in sharehold-

---

6. Treasury Income Tax Regulations Sec. 1.1371–1(g).

7. 46 TC No. 1, CCH Tax Court Reporter, 1966 Regular Decisions, at 2212–2213.

er's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change." (Emphasis supplied).

The decision in this case turns on the validity of the amended regulation, wherein it provides "Obligations which purport to represent debt but which actually represent equity capital will *generally* constitute a second class of stock". (Emphasis supplied).

After the trial of the case sub judice, the Tax Court rendered its decision in James L. Stinnett, Jr., et al. v. Commissioner, 54 TC 221, No. 20 (February 11, 1970). In *Stinnett* the court held that the amended regulation was invalid when applied to facts in that case. Stinnett involved a closely held corporation organized with a nominal amount of authorized capital stock wholly inadequate for its needs. The organizers and stockholders transferred partnership assets to the corporation and in return each stockholder received a promissory note equal to the amount of his capital account in the partnership. The promissory notes issued to the stockholders did not bear any relationship to the stock held by them.

Since the stockholders did not hold the notes of the corporation in the same proportion as they held the stock, the Commissioner contended that the notes represented contributions to capital, and a second class of stock, disqualifying the corporation for Subchapter S treatment under the federal tax laws. The Commissioner bottomed his case on the amended regulation.

The court held the regulation invalid as applied to the case under consideration. The court speaking through Judge Quealy, said:

"We do not regard 'generally' as controlling to a determination with respect to whether there is more than one class of stock within the meaning of section 1371(a), the question

whether 'debt' which may be characterized as 'equity' capital is disproportionate to the respective stock interests of the stockholders. Accordingly, we must hold the regulation invalid as applied to this case. To hold otherwise not only would serve largely to defeat the purpose for which Congress enacted subchapter S, but would be inconsistent with the underlying scheme of the statute as exemplified by section 1376(b) (2)".

The court held further:

"Since this type of transaction was clearly contemplated by the terms of the statute itself, and is the normal result of the operation of section 1376, it is only reasonable to assume that the Congress did not intend that debt owing to a stockholder of a subchapter S corporation would result in more than one class of stock under the 'thin capitalization' doctrine. That is not to say that an instrument called a 'note' may not by its very terms be something else. However, where the instrument is a simple installment note, without any incidents commonly attributed to stock, it does not give rise to more than one class of stock within the meaning of section 1371 merely because the debt creates disproportionate rights among the stockholders to the assets of the corporation.

We do not have to decide whether the notes involved in this case might nevertheless be treated as 'equity' for other purposes.

\*   \*   \*   \*   \*   \*

All we are called upon to decide is whether the corporation (International Meadows) had outstanding more than 'one class' of stock within the meaning of section 1371 of the Code. In the corporate or formal sense, clearly the corporation did not. There can be no question that under the laws of the State of California the corporation had outstanding 100 shares of common stock and nothing more. The only real question is whether in the

'tax sense'—in order to carry out the legislative intent—we are required to disregard the form of the incorporation in order to reach a different conclusion.

The statute does not prescribe any rules which we may look to for guidance. The underlying rationale of the 'thin capitalization' doctrine seems to be, however, going back to Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, that the court will disregard the form of the transaction where it is to some degree lacking in substance and a failure to do so would serve to frustrate the purpose of the taxing statute. As we have pointed out, this is not that type of case. In fact, the only result of a contrary holding on this case would be to defeat an election which the Congress clearly intended to be of benefit to the small and frequently 'thinly capitalized' business."

Judge James E. Doyle, District Judge for the Western District of Wisconsin, dealt with a problem similar to the problem involved in the case sub judice in Portage Plastics Company, Inc. v. United States, W.D.Wis., 1969, 301 F.Supp. 684. In *Portage* two individuals, who later became stockholders, advanced funds to the corporation in exchange for written instruments which provided that the corporation would pay each of them the sum of $12,500 on June 1, 1962, five years from the date of the instrument. The instruments were on standard note forms, and each provided that the corporation would pay interest in the amount of five percent of its net profits before taxes. The instruments provided that they might be renewed for an additional five years. This renewal option could be exercised only by the individuals but not by the corporation. During the first five-year period the individuals subrogated their rights in favor of two banks in exchange for an open line of credit in favor of the corporation. The instruments were renewed at the end of the first five-year period, and shortly thereafter the individuals exchanged them for

stock in the corporation. The corporation elected to obtain the tax benefits of Subchapter S. The issue presented to the court was whether the corporation had two classes of stock during the period in which the instruments were outstanding, thereby disqualifying the corporation for Subchapter S treatment under the federal tax laws. Judge Doyle, as the trier of the facts, determined that the advances constituted contributions to capital. The Commissioner, relying on the amended regulation, asserted that the contributions to capital constituted a second class of stock. Judge Doyle reviewed the legislative history concerning the adoption of Subchapter S and concluded that the contributions to capital did not constitute a second class of stock. Judge Doyle held:

" * * * The purpose of these provisions in general appears to have been to permit small businesses to select a form of organization without the necessity of taking into account major differences in tax consequences. * * *

* * * * * *

* * * The Senate Committee report indicates that the purpose of the requirement was to avoid the administrative complexities which would arise in general in the allocation of earnings or losses among several classes of stock, and in particular in allocation when there was a payment of dividends on preferred stock in excess of earnings. * * *

* * * * * *

It does not appear that the traditional debit-equity tests applied in other areas of tax litigation are relevant to the general purpose of Subchapter S or to the two conceivable purposes of the one class of stock requirement described above.

* * * * * *

It appears from the foregoing discussion that the general purpose of Subchapter S to permit small businesses to select a form of organization without regard to tax consequences

would be served by a conclusion that plaintiff was eligible to elect to be taxed as a small business corporation during the years in question. It further appears that the purposes of the one class of stock requirement, to avoid administrative complexities and to limit the advantages of Subchapter S status to small corporations, would not be served by a conclusion that the instruments in question constituted a second class of stock within the meaning of § 1371(a) (4). * * * "8

The attention of the court has been directed to the case of Brennan v. O'Donnell, 5 Cir., May 12, 1970, 426 F. 2d 218. This case involved an appeal from a decision and judgment of the District Court for the Northern District of Alabama. Brennan v. O'Donnell, 68–1 U.S.T.C. Par. 9314 (N.D.Ala.1968). The issue presented in Brennan was whether certain cash advances made by the plaintiff taxpayers to a corporation in which they were stockholders constituted a second class of stock for the purpose of determining the corporation's eligibility to obtain the special tax treatment made available by Subchapter S to a "small business corporation" and their shareholders. The District Court considered the case on the pleadings, the pretrial order, a stipulation of facts and documents and briefs filed by the parties. On the basis of the stipulated facts the District Court found in favor of the taxpayers. At the time the stipulation was made the Treasury Regulation provided, in part, "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock". The District Court considered the case in light of the regulation in effect at the time the stipulation was made. Before the District Judge made his decision the regulation was amended with retroactive effect. In the place of the sentence in the regulation just mentioned there was inserted the following sentence: "Obligations which purport to represent debt but which ac-

tually represent equity capital will generally constitute a second class of stock". The stipulation contained a provision that the parties had agreed that the advances represented equity capital. The Fifth Circuit remanded the case and vacated the judgment appealed from so that the action might be decided on a factual record made in light of the amended regulation, but expressly refrained from deciding the issue of the amended regulation's validity. The court said:

"We are of the opinion that the issue of whether taxpayers' advances to WFLI are to be treated as a class of stock in WFLI distinct from the common stock outstanding should be decided upon the basis of a factual record made in light of Treas.Reg. § 1.1371–1(g), as amended since the stipulation in this case was prepared. Accordingly, we vacate the judgment appealed from and remand the case for further proceedings. * * *

* * * * * *

* * * We refrain from reaching the issue of the amended regulation's validity in a case where resolution of this issue might prove to be unnecessary upon a redevelopment of the factual record. At the same time, considerations of fairness to taxpayers require that we relieve them from the effects of their stipulation that their advances to WFLI constituted 'equity capital' for the purposes of this case." 9

It is the court's judgment that *Brennan* does not control the decision in the case sub judice, since the main issue under consideration is the validity of the amended regulation.

█ The court feels that the reasoning of the Tax Court in *Gamman* and *Stinnett* and the reasoning of Judge Doyle in *Portage* are sound. The court adopts the holding in these cases as stating the more reasonable rule.

Applying the rule in *Gamman, Stinnett* and *Portage* to the facts as the

8. 301 F.Supp., at 691–694.

9. 426 F.2d at 221–222.

court finds them to exist in this action, the court holds that the advances made to plaintiff by the shareholders, Mrs. Williams and Mrs. Solomon, did not constitute a second class of stock and that plaintiff, during the period in question, qualified as a "small business corporation" under Subchapter S.

In view of the court's ruling aforesaid it is not necessary for the court to reach the other issues involved in the action.

The court adopts the findings of fact and conclusions of law which follow as the findings of fact and conclusions of law upon which the court bottoms its decision and judgment in the case.

## FINDINGS OF FACT

1) This action was instituted by plaintiff to recover the amount of $108,834.62 paid as income taxes and assessed interest for plaintiff's fiscal years ending June 30, 1962 and June 30, 1963. It arises out of certain adjustments made by the Commissioner of Internal Revenue to the plaintiff's federal income tax returns for the fiscal years ending June 30, 1962, 1963 and 1964.

2) The plaintiff is a Mississippi corporation whose principal business activity has been the operation of a cotton seed oil mill in Amory, Monroe County, Mississippi. Upon its organization in 1927, all of its authorized common stock (300 shares of $100 par value) was issued and, since that time, the plaintiff's common stock capitalization has been $30,000. The plaintiff's annual accounting period is the fiscal year ending June 30.

3) L. E. Puckett was one of plaintiff's incorporators and its chief executive officer until his death on November 24, 1928. He and the members of his family, or their estates, have always owned substantially all of plaintiff's stock. Mrs. L. E. Puckett was the sole beneficiary of the estate of L. E. Puckett. Mrs. Puckett died on May 28, 1963.

The decedent's son, E. L. Puckett, assumed plaintiff's presidency in 1929 and served as such until his death in 1968. During the years involved in this action, the 300 shares of plaintiff's common stock were held as follows:

| E. L. Puckett | 190 shares |
| Mrs. L. E. Puckett (or her estate) | 100 shares |
| W. L. Holland | 5 shares |
| E. V. Jones | 5 shares |

4) In 1929, plaintiff's corporate charter was amended to authorize the issuance of 150 shares of 8% participating preferred stock and, during that year, 135 shares were issued at their par value of $100 per share. The remaining 15 shares were never issued and, in 1946 and 1947, the issued shares were retired at par and cancelled. Since 1947, then, only common stock has been outstanding.

5) Throughout the plaintiff's existence, commencing with the year of incorporation (1927), members of the Puckett family have made advances to the plaintiff, evidenced by demand promissory notes bearing interest at 6% per annum. No repayments have been made to the Puckett creditors by plaintiff since February 1, 1947. The balance of plaintiff's notes payable to the members of the Puckett family on June 30, 1962, June 30, 1963 and June 30, 1964 was as follows:

| E. L. Puckett [10] | $ 24,008.37 |
| Mrs. Anna Solomon [10] | 30,000.00 |
| Mrs. Elnor P. Williams | 30,000.00 |
| Mrs. L. E. Puckett | 152,607.52 |
| Total | $236,615.89 |

6) With the exception of fiscal years 1957–1958 and 1958–1959, during all years the aforementioned notes have been outstanding, plaintiff paid interest at the rate of 6%. During the excepted years, interest was paid at a 2% rate. None of the advances made to plaintiff

10. Mrs. Solomon and Mrs. Williams are the daughters of E. L. Puckett. On July 1, 1961, he caused plaintiff to cancel $60,000 of notes payable to him and had that amount reissued as two $30,000 notes to the daughters.

by the Pucketts was secured, except for two deeds of trust. One deed of trust secured on October 1, 1937 note in the amount of $15,298.98 payable to E. L. Puckett. The security was certain gin machinery and real property. According to the depreciation schedule on plaintiff's fiscal 1962 tax return, the machinery was no longer owned by plaintiff at the start of the tax years here involved and presumably had previously been disposed of. With respect to the real property referred to in the deed of trust, the record reflects that it was owned by the Gilmore Puckett Lumber Co. and was not acquired by plaintiff until January 4, 1962. The other deed of trust, dated July 10, 1945, secured a promissory note in the amount of $74,553.95, payable to L. E. Puckett Estate, with certain described real estate, buildings and machinery. It was cancelled of record on July 4, 1964.

7) Plaintiff has borrowed money since the late 1940's from Union Planters National Bank, Memphis, Tennessee, all loans secured by promissory notes providing for the payment of specific rates of interest. At all times during which plaintiff was indebted to Union Planters, the bank held the individual guarantees of E. L. Puckett and Mrs. L. E. Puckett that the amount of plaintiff's outstanding indebtedness to the bank would be paid.

8) In all instances of loans to plaintiff by the bank, the members of the Puckett family who had advanced money to plaintiff executed and filed with the bank a Subordination Agreement whereby they subordinated their claims against the plaintiff to those of the bank. The extent of the subordination was that each Puckett agreed not to withdraw from plaintiff any part of plaintiff's indebtedness to him until all indebtedness of plaintiff to the bank had been paid in full.

9) The plaintiff took out a $100,000 insurance policy on the life of E. L. Puckett and assigned it to the bank as additional security for plaintiff's indebtedness to the bank.

10) During the period from 1959 through 1964, the balance in plaintiff's notes payable account to the bank varied from a low of $40,000 to a high of $1,005,000. At the end of the fiscal years 1962, 1963 and 1964, the balance was $40,000, $105,000, and $575,000, respectively.

11) At the end of each of the years involved, plaintiff owed Bradley Gin Company $10,000 and the Mississippian Railway $35,000. E. L. Puckett owned $\frac{1}{3}$ of the stock of the latter corporation and was its president. Plaintiff paid interest at the rate of 5% per annum on this unsecured loan. At the end of fiscal 1964, plaintiff was indebted to F & A Guaranty Company, a sole proprietorship owned by E. L. Puckett, in the amount of $35,000. This debt was unsecured and plaintiff's records, although not completely clear, indicate that no interest was paid.

12) On November 25, 1958, plaintiff filed with the District Director of Internal Revenue, Jackson, Mississippi, an election to be taxed as a "small business corporation" under Subchapter S of the Internal Revenue Code. It thereupon proceeded annually to file Forms 1120–S, United States Small Business Corporation Return of Income. Prior to its fiscal year ending June 30, 1959, the first year for which the Subchapter S election was effective, plaintiff had never declared any dividends on its stock.

13) The plaintiff's income tax returns for the fiscal years ending June 30, 1962, 1963 and 1964 became the subject of an audit by an Internal Revenue Agent. The following adjustments were made and are hereby an issue.[11]

(a) The deductions claimed by the plaintiff for payments to the Puckett family as interest on their advances to the plaintiff were disallowed in all three years, on the Commissioner's de-

---

11. Other adjustments were made which are not involved, having been conceded by either plaintiff or defendant.

termination that the advances constituted equity rather than debt obligations and payments were dividends rather than deductible interest.

(b) The election to be treated as a Subchapter S corporation was terminated and, accordingly, the plaintiff was taxed on its net earnings. This was occasioned by the Commissioner's determination that the Puckett advances which were considered equity constituted a second class of stock, the existence of which disqualifies a corporation from small business corporation treatment.

(c) With respect to the fiscal year ending June 30, 1964, the Commissioner determined that plaintiff's ending cotton seed inventory, which under plaintiff's method of accounting was to be valued at the lower of cost or market, was undervalued. The Commissioner found that the 5,349 tons on hand on June 30, 1964 should be valued at $58.05 per ton. On its return, plaintiff used a value of $55.95 per ton, but in this litigation asserts that the proper value of $54.80 per ton, based on the average cost of two purchases, one on June 28, 1963 and one on July 2, 1964. The Commissioner's figure was the average cost of all June, 1964 purchases. The tax effect of this adjustment was to decrease the cost of goods sold for the year by $11,223.42.

(d) The plaintiff's return for fiscal 1964, as filed, reflected a loss of $76,835.17. By virtue of the adjustments described in (a) and (c) above, plus other adjustments not in issue, the Commissioner reduced this claim loss to $51,320.04. He then determined that this loss, under the applicable carryback provisions of the Code, should be carried back to the fiscal year ending June 30, 1961. The plaintiff claims that the proper year to which the loss should be carried is the fiscal year ending June 30, 1962.

14) The plaintiff paid the additional taxes and assessed interest occasioned by the Commissioner's adjudgments, filed timely claims for refund which were disallowed, and instituted this suit.

15) There are four issues presented for resolution:

(a) Whether the advances made to the plaintiff by its stockholders constituted loans or contributions to capital.

(b) If the advances referred to in (a) above were contributions to capital, did they constitute a second class of stock, thus disqualifying plaintiff for treatment as a "small business corporation" for federal tax purposes.

(c) What was the proper value of plaintiff's cotton seed inventory on June 30, 1964, for the purpose of determining plaintiff's net operating loss in that year.

(d) If plaintiff did not qualify as a "small business corporation" during the fiscal years ending June 30, 1962, 1963 and 1964, whether the net operating loss incurred in fiscal 1964 must be carried back and applied against the net income earned in the fiscal year ending June 30, 1961.

16) The advances made by the shareholders to the plaintiff were in the nature of contributions to capital.

17) The advances made by the shareholders to the plaintiff did not constitute a second class of stock so as to disqualify plaintiff from obtaining treatment as a Subchapter S "small business corporation" for federal tax purposes.

18) The proper valuation of plaintiff's June 30, 1964 cotton seed inventory, under the plaintiff's method of using the lower of cost or market value, was $58.05 per ton. This was the value as determined by the Commissioner of Internal Revenue, and it is presumed to be correct. Plaintiff had the burden of proving its incorrectness and failed to carry that burden.

## CONCLUSIONS OF LAW

1) The court has jurisdiction of the parties and subject matter of this litigation. 28 U.S.C.A. § 1346(a) (1).

2) Application of the series of factors used by the courts to ascertain whether the questioned advances constitute contributions to capital leads to the conclusion that the instant advances constitute contributions to the capital of plaintiff corporation. Relevant in this connection are the following facts: the absence of any maturity date; the lack of any repayments from 1947 through the years in suit; the absence of any demand for repayment; the fact that the plaintiff was thinly capitalized; the complete subordination of the advances to bank loans; the lack of any sinking fund, other security or realistic creditor safeguards as to the shareholder's advances; the identity of interest between the shareholders as a group, the group advancing the "loans", and plaintiff's management; the lack of adequate funds to repay the advances in an orderly fashion; and the fact that plaintiff redeemed its preferred stock and left its shareholder advances outstanding. Tyler v. Tomlinson, supra; Berkowitz v. United States, supra; Montclair, Inc. v. Commissioner, supra.

3) The promissory notes from Amory Cotton Oil Company to the Puckett family members do not constitute a second class of stock and the Company did, therefore, qualify as an electing "small business corporation". Plaintiff corporation during the years involved in this cause of action did not have two classes of stock and was entitled to the treatment provided by Subchapter S of the Internal Revenue Code of 1954. James L. Stinnett, Jr. v. Commissioner, supra; Gamman v. Commissioner, supra, and Portage Plastics Company, Inc. v. United States, supra.

4) Plaintiff Amory Cotton Oil Company should be allowed its claims for refund of the amounts paid as income taxes for its fiscal years 1962 and 1963, together with assessed interest paid thereon, statutory interest allowable on this suit, and all costs incurred herein. In addition, the judgment to be entered in this cause should reflect that plaintiff corporation is entitled to investment credit on its qualified investment in Section 38 property in its 1963 fiscal year, with the total qualified investment in such property being a total amount of $53,591.24.

A final judgment in accordance with this opinion may now be prepared and presented for entry.