**Jean C. TYLER and Dolly Ann Tyler, Appellants,**

v.

**Laurie W. TOMLINSON, District Director of Internal Revenue, Appellee.**

**No. 25896.**

United States Court of Appeals
Fifth Circuit.
July 29, 1969.

Samuel L. Payne, Frank C. Decker, Jacksonville, Fla., for appellants.

Johnnie M. Walters, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Richard C. Pugh, Acting Asst. Atty. Gen., Dept. of Justice, Tax Div., Washington, D. C., Lee A. Jackson, Elmer J. Kelsey,

Attys., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Jacksonville, Fla., Mitchell Rogovin, Asst. Atty. Gen., Crombie J. D. Garrett, Marco S. Sonnenschein, Attys., Dept. of Justice, Washington, D. C., for appellee, Virginia Q. Beverly, Asst. U. S. Atty., of counsel.

Before WISDOM, THORNBERRY and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This is another debt-equity case. We are asked once again to determine whether funds advanced to a corporation by its shareholders may be treated as Internal Revenue Code indebtedness for purposes of interest deductions, 26 U.S. C.A. § 163,[1] or whether such funds are more properly considered contributions to capital and the deductions based thereon disallowed.

We begin with the year 1959 when brothers Neal and Jean Tyler operated a partnership that distributed Schlitz beer in several northern Florida counties. In April of that year the Tyler brothers formed a corporation known as Neal Tyler & Sons, Inc., becoming and remaining for all times relevant herein its sole shareholders. They transferred to the new corporation all of the assets of their old partnership in exchange for the corporation's authorized capital stock and two promissory notes. The stock consisted of 1,000 shares of common at a par value of $10.00 per share. Each brother received 500 shares. The notes were payable on demand and bore an interest rate of five percent. One in the amount of $47,000 was payable to Jean Tyler; the other in the sum of $48,500 was payable to Neal Tyler. The stock and notes roughly approximated the brothers' proportionate partnership interests.

On June 24, 1959, the corporation executed a demand note in the amount of $59,708.67 payable to the Barnett National Bank. This created a line of credit in the corporation's favor in order to permit cash payments for beer. The note was personally guaranteed by the Tyler brothers who had subordinated their notes to the Bank shortly after incorporation.

On July 30, 1962, the corporate notes payable to Neal and Jean Tyler were released by the Bank for cancellation. New notes were then issued to the brothers in identical amounts and on identical terms except that they were specifically subordinated both as to principal and interest to the claims of *all* corporate creditors.[2]

During the first months of its operation, Neal Tyler & Sons, Inc., showed on its balance sheet a capital surplus of $14,388.21 consisting of $10,000 of capital stock and the rest of outstanding surplus. The promissory notes to the Tyler brothers in the amount of $95,500 appeared as "advances by stockholders." No interest or principal on outstanding notes had as yet been paid.

For the fiscal year ending May 31, 1960, the corporation showed on its balance sheet interest payments on its notes of $2,719.03 ($2,469.03 to Neal Tyler; $250.00 to Jean Tyler) and additional accrued interest of $2,754.15. In 1961 no interest or principal payments were made, and in 1962 the only payment was of interest to Jean Tyler in the amount of $1,315.00.

In its tax return for the fiscal year ending May 31, 1960, and in its return

---

1. 26 U.S.C.A. § 163. Interest

   (a) *General Rule.*—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

       *     *     *     *     *

2. The pretrial stipulation indicates that the 1962 resubordination of the Tyler notes was a subordination to the claims of *all* corporate creditors. Some of the testimony indicates on the other hand that in 1962 the notes were subordinated only to the claims of the Barnett National Bank and one other creditor. In light of the subordination to the Bank and the absence of testimonial particularity as to unsubordinated creditors, this disparity can be accorded little if any significance.

for the year ending May 31, 1962, the corporation claimed interest deductions in the above listed amounts. The Commissioner, however, determined that the alleged principal and interest payments to Neal and Jean Tyler constituted dividend payments rather than interest and principal payments, and disallowed the deductions. The Commissioner also assessed deficiencies in the tax returns of Jean and Neal Tyler and the returns of their wives, Dolly and Beatrice, for failure to include some of the interest payments as income on their tax returns. All parties then paid the deficiency assessments and brought suit for refund. The refund suits were consolidated and the court, after considering the stipulations of the parties and after hearing the evidence on behalf of the taxpayers, granted the government's motion for directed verdict.

On this appeal the primary issue is whether the district court should have allowed the debt-equity question to go to the jury. The government contends that the evidence was so overwhelmingly in its favor that a directed verdict was properly granted. The taxpayers argue that enough facts were in dispute to create a question for the jury. As will appear more fully, *infra*, we agree with the government and affirm. In reaching this result we consider first the relevant legal principles on the debt-equity controversy and verdict.

I.

█ The problem of whether advances by stockholders to closely held corporations are to be considered as debts or contributions to capital has often been considered by this court. Berkowitz & Kolbert, etc. v. United States, 5 Cir. 1969, 411 F.2d 818 [May 13, 1969]; Curry, et al. v. United States, 5 Cir. 1968, 396 F.2d 630, cert. denied, 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375 (U. S. Nov. 26, 1968); Harlan, et al. v. United States, 5 Cir. 1969, 409 F.2d 904 [April 4, 1969]; Tomlinson v. The 1661

Corporation, 5 Cir. 1967, 377 F.2d 291; United States v. Snyder Brothers Co., 5 Cir. 1966, 367 F.2d 980, cert. denied, 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104; Aronov Construction Co. v. United States, M.D.Ala.1963, 223 F.Supp. 175, aff'd per curiam, 5 Cir. 1964, 338 F.2d 337; Montclair, Inc. v. Commissioner of Internal Revenue, 5 Cir. 1963, 318 F.2d 38; Campbell v. Carter Foundation Production Co., 5 Cir. 1963, 322 F.2d 827; Rowan v. United States, 5 Cir. 1955, 219 F.2d 51. It has not, however, proved susceptible to easy resolution. While some legal problems are endowed with a case by case uniqueness calling for *ad hoc* determinations, the debt-equity problem has exhibited a special kind of uniquity. The oft-cited principle that each case "must be judged on its own unique fact situation," see Tomlinson v. The 1661 Corporation, *supra*; Curry, et al. v. United States, *supra*, has resulted in a lack of decisional uniformity even in cases where the individual creditor-debtor relationships exhibit ostensible similitude. [See Stone, Debt-Equity Distinction in the Tax Treatment of the Corporation and its Shareholders, 42 Tulane Law Review 251, 254–255 (1968)]. We thus face the undesirable but perhaps unavoidable consequence that this field of the law continues to defy symmetry. Decisions must be based on a wide variety of considerations, including the financial viability of the corporation, the manner in which corporate debts are created and shareholder equities distributed, the financial source from which corporate repayment is to be anticipated, the identity of interest between shareholder and creditor, and whatever else appears relevant. This diversity helps explain why no simple test for the resolution of debt-equity questions has ever emerged. Instead there have evolved "at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness." Montclair, Inc. v. Commissioner, *supra*, 318 F.2d at 40.

These factors have been enumerated with some specificity as follows:

"(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions." Montclair, Inc. v. Commissioner, *supra*, at 40.

To this already comprehensive list other courts have added such criteria as: 1) the extent to which the initial advances were used to acquire capital assets, Janeway v. Commissioner of Internal Revenue, 2 Cir. 1945, 147 F.2d 602, and 2) the failure of the debtor to pay on the due date or to seek a postponement, Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir. 1942, 132 F.2d 182. Undoubtedly a further search of the cases would reveal yet other considerations that would add additional inquiries to this baker's dozen, but such a search would be a labor of supererogation. The object of the inquiry is not to count factors, but to evaluate them. No single factor can be controlling. John Kelley Co. v. Commissioner of Internal Revenue, 1946, 326 U. S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278, 284. As we have said elsewhere in situations requiring the quest for a solution among myriad criteria: "We think that the tests are, at most, helpful factors to be considered, and not fiats to be bound by. We disapprove of rubricating such 'tests' into talismans of magical power." Georgia Southern & F. Ry. Co. v. Atlantic Coast Line R. Co., 5 Cir. 1967, 373 F.2d 493, 498, cert. denied, 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 120.

Application of the above principles to the case *sub judice* leaves no doubt that the advances to the Tyler corporation were nothing more than contributions to capital. In the first place the corporation was inadequately financed. While the concept of inadequate capitalization is today more coolly and modestly applied than in former years, see Rowan v. United States, 5 Cir. 1955, 219 F.2d 51, 55, it has not been completely spurned. United States v. Henderson, 5 Cir. 1967, 375 F.2d 36, 40, cert. denied 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 362. We have been careful to note that "thin capitalization" is "very strong evidence" of a capital contribution where: "(1) the debt to equity ratio was high to start with, (2) the parties understood that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations." United States v. Henderson, 5 Cir. 1967, 375 F.2d at 40. Thin capitalization is also of significance where combined with "subordination to other indebtedness." Rowan v. United States, *supra*, 219 F.2d at 55.

In the present case the financial condition of Neal Tyler & Sons, Inc., is of considerable importance. The corporation was started with a capital surplus of slightly over $14,000 and an indebtedness of $95,500. This gave it a debt equity ratio of approximately 7 to 1. Several months later the equity had not changed appreciably, but the corporation's indebtedness had risen almost $60,000 as a result of institutional borrowing necessitated by the need for operating capital. This need must have been obvious from the outset. The borrowing itself was made possible only by the subordination of the Tyler notes to the claims of the bank, see Aranov Construction Company v. United States, M. D.Ala.1963, 223 F.Supp. 175, 176, aff'd, 338 F.2d 337; Montclair, Inc. v. Commissioner, *supra*, 318 F.2d at 40, and the advances to the corporation were devoted entirely to the acquisition of capital assets, i.e., the assets of the old

Tyler partnership. Cf. Janeway v. Commissioner, *supra*; Berkowitz v. United States, *supra*. Under these circumstances the undercapitalization of the Tyler corporation is "very strong evidence" that a genuine indebtedness was never incurred.

Our conclusion in this regard is confirmed by the character of the notes themselves. These created no realistic creditor safeguards and no genuine expectations of payment. They contained no enforcement provisions, no specific maturity dates, and no sinking fund from which payments of interest and principal might be made. "Other than the income from taxpayer's property there was no fund or other source from which the advances * * * might be repaid." Berkowitz, *supra*. See A. R. Lantz Co. v. United States, C.D.Calif. 1968, 283 F.Supp. 164, 170. Furthermore, the notes were unsecured. While they did contain a provision for payment on demand, such a provision cannot be realistically considered as manifesting a genuine interest in repayment in view of the financial condition of the corporation and the complete identity of shareholders and noteholders. A demand for payment of the Tyler notes would have completely havocked the corporation with bankruptcy as a possibility. While normally such a drastic consequence is not unacceptable to a creditor in search of repayment, the position of the Tylers as sole managers and shareholders of the corporation so undermined the traditional dichotomy between debtor and creditor that exercise of the demand provision under any normal circumstances was extremely unlikely. *Cf.* A. R. Lantz Co. v. United States, *supra*, at 170. Furthermore, "although the notes were demand in form, the right to demand repayment could not properly be exercised until the bank loans had been paid in full." Affiliated Research, Inc. v. United States, 1965, 351 F.2d 646, 649, 173 Ct.Cl. 338.

We note finally the inconstancy with which the Tyler corporation made interest payments on its notes, see Curry, et al. v. United States, 5 Cir. 1968, 396 F. 2d 630, 634, and the fact that the Tylers, "who had complete control and management of the taxpayer advanced the taxpayer money in direct proportion to their ownership of its capital stock." Berkowitz, etc. v. United States, *supra*. The failure to insist on regular interest payments indicates that the Tylers were "not seriously expecting any substantial interest income, but [were] interested in the future earnings of the corporation or the increased market value of [their] interest." Curry, et al. v. United States, *supra*, 396 F.2d at 634. Similarly the pro rata loans by shareholders indicate that the Tylers intended to put their money "at the risk of the business," A. R. Lantz Co. v. United States, C.D.Calif.1968, 283 F.Supp. 164, 170, in order to support the equity that they had previously owned in partnership form. "As long as the 'debt' money is contributed pro rata, the equity benefit derived from the additional investment in debt form is no less than it would have been if all the shareholders had bought additional equity. Only the tax consequences are different." Stone, Debt-Equity Distinction in the Tax Treatment of the Corporation and its Shareholders, *supra*, at 258. Courts are recognizing more and more that a loan proportionate to stock ownership becomes a form of *pari passu* equity. See Berkowitz, etc. v. United States, *supra*; Charter Wire, Inc. v. United States, 7 Cir. 1962, 309 F.2d 878, 880, cert. denied 372 U.S. 965, 83 S.Ct. 1090, 10 L.Ed.2d 129. When such "loans" are used to buy capital assets and are subordinated to the claims of other creditors they tend to become, as they did here, a means of transubstantiating one kind of equity into another. The Tyler loan was thus the vehicle for the conversion of partnership equity into corporate equity. *Cf.* Sayles Finishing Plants, Inc. v. United States, 1968, 399 F.2d 214, 220, 185 Ct.Cl. 196. The money they advanced admirably served to shore up their shareholder interest in the corporation without conferring on them the greater financial security that creditors usually enjoy. Under

such circumstances little weight can be given to the subjective intent to create an indebtedness. As we have said in United States v. Snyder Brothers Company, 5 Cir. 1966, 367 F.2d 980:

"The problem is not one of ascertaining 'intent' since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes."

■ Where, as here, there is capital insufficiency, subordination to the claims of other creditors, advances proportionate to stock ownership, lack of creditors safeguards, identity of noteholders and stockholders, unrealistic maturity and sporadic interest payments, there can be no doubt that the advances were risk capital and not business loans. To hold otherwise would be to ignore the plain facts and to elevate form over substance. Tax law requires that creditorship have genuine existentiality. *Cf.* Kraft Foods Company v. Commissioner of Internal Revenue, 2 Cir. 1956, 232 F. 2d 118, 128. This requires more than a declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclatural captions. We deal here with notes that were conceived in equity and held as equity. It is only just that they should also be taxed as equity.

■ Appellants contend that the facts are not overwhelming enough to justify a directed verdict. They argue that the testimony of Jean Tyler clearly showed that the "corporate stock and promissory notes in question were given in payment for the assets of the former partnership which had engaged in the business to be taken up by the corporation in question." We have no quarrel with this statement, but we do not perceive how it destroys the validity of the directed verdict. If appellants mean to say that a mere showing of an intent to create an indebtedness and the existence of something called "notes" is sufficient to take their case to the jury, we must

disagree. If that were true, every debt-equity case would require a jury verdict no matter how transparent the attempt at tax avoidance. We therefore look not to mere labels or to the self-serving declarations of the parties, but to the more reliable criteria of the circumstances surrounding the transaction. If none of these circumstances are in dispute, there is no jury question. As this court recently observed: "It is not the jury's function to determine whether the undisputed operative facts add up to debt or equity. This is question of law." Berkowitz, etc. v. United States, *supra*. We have searched appellants' brief in vain for any reference to a factual dispute requiring jury resolution. Finding none, we fail to see how appellants have been aggrieved by the directed verdict.

■ Appellants also challenge the directed verdict on the grounds that it was based on criteria considered irrelevant by this court in Tomlinson v. The 1661 Corporation, *supra*. They first contend that failure to pay interest and/or principal is not pertinent to the debt-equity question. In so arguing, however, they appear to have overlooked our decisions in United States v. Henderson, 5 Cir. 1967, 375 F.2d 36, 40, Curry, et al. v. United States, *supra*, 396 F.2d at 634, and Berkowitz, etc. v. United States, *supra*. In *Henderson* and *Berkowitz* we indicated that the absence of interest and/or principal payments is a factor to be considered in determining whether "notes" ought to be treated as creating legitimate indebtedness for tax purposes. We do not read *Tomlinson* as a repudiation of this concept. See Tomlinson v. The 1661 Corporation, *supra*, fn. 19, 377 F.2d at 299. See also *Berkowitz, supra*. Nor do we find that the sporadic payment of interest and principal as opposed to the complete absence of such payments destroys the relevance of such an inquiry. See Curry, et al. v. United States, *supra*, 396 F.2d at 634.

Appellants' second objection relates to subordination. They contend that subordination to the claims of other credi-

tors is significant only if it involves subordination to *"all* of the corporation's indebtedness whether already incurred or *to be incurred at any time in the future."* [emphasis in original] Tomlinson v. The 1661 Corporation, supra, 377 F.2d at 299.

■ The above language taken from United States v. Snyder Brothers Company, 367 F.2d at 981, was quoted in *Tomlinson* only for the purpose of showing the type of situation in which subordination "weighs *heavily* toward an equity participation and against the existence of a bona-fide debtor-creditor relationship." [emphasis added] *Tomlinson, supra,* at 298. The Tomlinson court did not say that less extreme examples of subordination were to be ignored. Such a reading of *Tomlinson* would be clearly inconsistent with earlier rulings of this court, Aranov Construction Company v. United States, *supra*; Montclair, Inc. v. Commissioner, *supra*, and inconsistent with the statement in *Tomlinson* itself that "subordination is * * * one of the factors for consideration * * *." Tomlinson v. The 1661 Corporation, *supra*, at 297. While subordination is not, of course, decisive of the debt-equity question, United States v. Snyder Brothers Company, *supra*, 367 F.2d at 983, it was certainly a proper factor of consideration in the district court's decision to grant a directed verdict. Appellants have failed to discharge their burden of proving that they are entitled to the claimed deductions. United States v. Byck, 5 Cir. 1963, 325 F.2d 551.

## II.

In addition to the debt-equity question, this appeal as originally filed involved a controversy over a casualty loss deduction claimed by Neal and Beatrice Tyler. In their 1960 income tax return, the Tylers had claimed a casualty loss deduction of $1,246.00 resulting from termite damage to their home. The Commissioner disallowed the deduction on the ground that the taxpayers had failed to make a claim on the guaranty of the Orkin Company which had been annually inspecting their house for termite infestation. At trial the district court directed a verdict on this issue for the government. The court ruled that a casualty loss deduction would be improper because the loss was compensable by the Orkin guaranty. See 26 U.S.C.A. § 165.[3] The court did not reach the question of whether the termite damage would have entitled the taxpayer to a casualty loss if compensation on the guaranty was unavailable.

Prior to oral argument in this court, the government has had a change of heart on the legal soundness of its position. It now appears that both the government and the counsel for the taxpayer misapprehended the nature of the Orkin Company's guaranty. Initially the government "had understood this guaranty to be for the repair of taxpayers' premises damaged by termites." A reinspection of the contract, however, has convinced the government that it covers only "retreatment of termite-infested areas." Accordingly, the government has notified us that it will not "defend the District Court's directed verdict on the termite loss issue further, on the ground that the loss was covered by the Orkin guaranty."

We have examined the Orkin Company's guaranty and find no recourse therein for the Tylers that would justify the district court's directed verdict.[4]

---

3. 26 U.S.C.A. § 165. Losses
(a) General rule:—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
       *       *       *       *       *

4. The Orkin guaranty provides in pertinent part as follows:
"MASSACHUSETTS BONDING AND INSURANCE COMPANY, 10 Post Office Square, Boston 9, Massachusetts, (hereinafter called Surety), GUARANTEES unto the holder of

We agree with the government's new found position that the Tylers had no obligation to seek recovery on a bond that would not have recompensed them for the kind of loss they sustained. In so holding, however, we intimate no view on whether or not the damage to the Tylers' home qualifies for a deduction as a casualty loss under Section 165 of the Internal Revenue Code. This issue is not properly developed by the record before us. We therefore remand the taxpayers' casualty claim to the district court for further proceedings not inconsistent with this opinion.

Affirmed as to Part I, reversed and remanded as to Part II.

any of the following described Guaranties when duly authorized and properly issued by ORKIN EXTERMINATING COMPANY, INC. (A Georgia Corporation) or any of its duly authorized subsidiaries listed in Appendix A attached hereto (hereinafter individually and collectively called Orkin):

*     *     *     *     *

THAT said Orkin will discharge its obligation to retreat the premises described in such issued Guaranty in the event of reinfestation within the stated period in accordance with the terms and conditions of said Guaranty, and also that in accordance with the terms and conditions of said Guaranty it will discharge its obligation, if any, as set forth therein to make or cause to have made repairs or replacements in the event of new damage to the described premises and contents by Subterranean Termites after examination and during the period that such issued Guaranty is in full force and effect, * * *"