**FLORIDA–GEORGIA CORPORATION,**
Plaintiff,

v.

**The UNITED STATES of America,**
Defendant.

Civ. A. No. 850.

United States District Court,
M. D. Georgia,
Valdosta Division.
July 27, 1971.

Edwin G. Barham, Valdosta, Ga., for plaintiff.

William J. Schloth, U. S. Atty., Macon, Ga., for defendant.

BOOTLE, Chief Judge:

Plaintiff (corporate-taxpayer) brings this action pursuant to 28 U.S.C.A. § 1346(a) (1), for a refund of income taxes paid, claiming that the Commissioner erroneously determined that property transferred to plaintiff by its incorporators-sole stockholders constituted a contribution to capital rather than a sale.

The controlling facts are undisputed. On March 2, 1964, Mr. Country Johnston purchased 465 acres of land in Valdosta, Georgia, from a Mr. Warwick, the purchase price being $70,000, with a $20,000 cash down payment and execution of nine promissory notes totaling $50,000 for the balance. On the following day Johnston transferred a one-fourth in-terest each to Messrs. Carroll, Sullivan and Strickland. On March 16, 1964, these individuals formed Lake Frances Investments, a partnership, and transferred to it the property purchased from Mr. Warwick and the debt related thereto. The partnership subsequently purchased additional land adjacent to the Warwick tract.

Within the 465 acre Warwick tract was a large lake known as Lake Frances which the partners recognized as a potential site for a residential subdivision. On May 28, 1964, for the exclusive purpose of developing the Lake Frances area, the partners caused plaintiff to be incorporated. Authorized capital stock was $20,000, and although it had all been subscribed by the four partners only $1,000 was paid in. The four partners were the sole stockholders and directors of the corporation.

The corporate-plaintiff lay dormant until December 15, 1964 when the approximately 75 acres constituting the Lake Frances area were transferred to it by the partners. The admitted purpose of the delay in effectuating the transfer of land to plaintiff was to allow 6 months to pass from the date of the acquisition of the land by the partnership so that favorable capital gains tax treatment could be received. The transfer was in the form of a "sale", the purchase price being $160,000 (a price based on a written real estate appraisal), which price was to be paid in installments, the debt being evidenced by four $40,000 notes, one issued to each partner, bearing interest at the rate of 4% and secured by a security deed. Neither at the time of incorporation nor later did plaintiff have any capital assets other than the $1,000 paid-in capital and the equity of redemption in the 75 acre tract. At no time relevant to this case did the plaintiff engage in any business other than the development of the Lake Frances tract, which development constituted the only foreseeable source of income for plaintiff. The partners originally contemplated that the only source of funds for payment of the corporate indebted-

ness incurred through purchase of the land would be the profits from the sale of lots out of the said land.[1]

In developing the tract for sale plaintiff would incur development costs. To meet these costs and to make partial payments on the real estate mortgage, (which payments were subsequently made) the plaintiff borrowed $65,000 from the First National Bank of Valdosta on July 2, 1965 and $35,000 on July 1, 1966. (The paid-in capital of plaintiff had not been increased). The loans to the corporation were guaranteed by the stockholders.

Plaintiff developed the 75 acre tract and began sale of the lots. Many of the lot purchasers bought on an installment basis. The purchaser would make a down payment and execute an installment note in favor of the plaintiff for the balance. The corporation would assign these notes to the four shareholders who periodically assigned them to the First National Bank as a pledge for one or more loans made by the Bank to plaintiff, which loans were also endorsed individually by said shareholders. The bank received both the down payment and the installment payments of the lot purchasers which it applied against plaintiff's indebtedness. (The corporation reported these payments on its tax return as ordinary income). As each sale was made by the corporation, Mr. Warwick, upon being paid a proportionate amount on

the original note given to him by Mr. Johnston, and assumed by the partners, would release the lot being purchased from the mortgage possessed by him. The partners also released the lot from their mortgage on the land. (See page 21 of the deposition of Country Johnston, taken February 24, 1971).

Since the partners in the Lake Frances Investments partnership and the stockholders in the plaintiff were the same, the activities and financial transactions of both entities were extensively intermingled, with money from whichever entity had the funds available used to satisfy obligations of either entity. At the end of the year, adjusting entries were made on the books of both the partnership and plaintiff which usually resulted in the partnership's owing money to the plaintiff. This obligation was satisfied by the reduction of plaintiff's indebtedness to the partners. In this manner payments of interest and principal were made on the corporate notes to the partners.

The partners considered the entire venture as speculative and involving some substantial risk of success. (See deposition of Mr. Sullivan, page 43).

For the years 1965 and 1966 plaintiff filed its Federal Income Tax Return, paying the taxes due thereon, claiming a basis on the land of $160,000 and deductions for interest paid the stockholders on the purchase money notes. The Commissioner of Internal Revenue deter-

---

1. It stands admitted that tax considerations were the primary if not the sole motivation behind formation of plaintiff. First, several of the partners possessed significant real estate holdings held for investment purposes. They were afraid that if they, as individuals, or as a partnership, had engaged in the development of the Lake Frances tract and sold lots therefrom they would run the risk of being classified for tax purposes as being in the business of selling real estate, thereby, losing the right to take advantage of the favorable capital gains rate on the later sale of these other real estate investments. Second, they desired to have the profits from the "sale" of the land to the corporation taxed as capital gains.

In this regard, had the plaintiff prevailed before the Commissioner of Internal Revenue, not only would the partners have received capital gains treatment on their profits from the sale, but, as sole stockholders of plaintiff corporation, they would benefit substantially on the profits made by the corporation on the sale of lots. If the transaction were a sale, then the corporate basis in the land would be the sale price of $160,000 rather than the price paid by the partners. Further, if a sale, plaintiff would be able to deduct the interest payments to its stockholders, which deductions would also benefit the stockholders in their status as stockholders.

mined that the transfer of the property by the stockholders to plaintiff was not a sale; therefore its basis in the land would be the transferers' cost basis, $70,000, and not the $160,000 recited as the purchase price for the property. This adjustment increased plaintiff's gain on the sale of lots during the years in suit. Further, the Commissioner determined that the four notes plaintiff issued to the partners were really representative of equity interests rather than indebtedness, so that plaintiff was not entitled to a deduction for any "interest" which might have been paid on the notes. The assessment here complained of followed.

Section 362, Internal Revenue Code of 1954 (26 U.S.C. § 362) provides:

"(a) Property acquired by issuance of stock or as paid-in surplus.—If property was acquired on or after June 22, 1954, by a corporation—

\* \* \* \* \* \*

"(2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer."

Thus, based on this code section, we are asked to determine whether the property transferred to plaintiff by its sole shareholders may be treated as Internal Revenue Code indebtedness or whether such transfer must be considered as a contribution to capital. This is a frequently litigated area of tax law. See, e.g., Tyler v. Tomlinson, 414 F.2d 844 (5th Cir. 1969); Berkowitz v. United States, 411 F.2d 818 (5th Cir. 1969); Curry v. United States, 396 F.2d 630 (5th Cir. 1968), cert. den. 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375; Tomlinson v. 1661 Corporation, 377 F.2d 291 (5th Cir. 1967); United States v. Snyder Brothers Company, 367 F.2d 980 (5th Cir. 1966). As the controlling facts are undisputed, the problem is one of law and is thus appropriate for resolution by summary judgment. See Berkowitz v. United States, *supra*. Further, the in-tent of these parties is not controlling in characterizing the transaction for federal tax purposes. United States v. Snyder Brothers Company, *supra*.

It has been frequently stated that each case, involving advances to closely held corporations by its stockholders, wherein the issue of debt versus equity arises, must be decided on its own unique factual situation and that no single test, or cumulation of tests, is controlling or decisive in resolving the issue. "[T]here have evolved 'at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness.' Montclair, Inc. v. Commissioner [of Internal Revenue], *supra*, 5 Cir., 318 F.2d [38] at 40." Tyler v. Tomlinson, *supra* 414 F.2d at 847.

"These factors have been enumerated with some specificity as follows:

"'(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions.' Montclair, Inc. v. Commissioner [of Internal Revenue] *supra*, [318 F.2d] at 40.

"To this already comprehensive list other courts have added such criteria as: 1) the extent to which the initial advances were used to acquire capital assets, Janeway v. Commissioner of Internal Revenue, 2 Cir. 1945, 147 F. 2d 602, and 2) the failure of the debtor to pay on the due date or to seek a postponement, Commissioner of Internal Revenue v. Meridian & Thirteenth

Realty Co., 7 Cir. 1942, 132 F.2d 182." Tyler v. Tomlinson, *supra*, at 848.

█ Applying these principles to the case *sub judice*, the conclusion is inescapable that the transfer was nothing more than a capital transfer as opposed to a transaction creating a bona fide indebtedness. The corporation from its inception was inadequately financed. Its avowed purpose was to acquire and develop the Lake Frances area. Yet only $1000 in capital was paid in—this for the purchase of land valued at $160,000 and for its development, an expensive proposition in itself. While this Circuit, perhaps, applies the concept of inadequate or thin capitalization today somewhat more coolly and modestly than in former years, see Rowan v. United States, 219 F.2d 51, 55 (5th Cir. 1955); it has not been repudiated. Tyler v. Tomlinson, *supra*, 414 F.2d at 848; United States v. Henderson, 375 F.2d 36 (5th Cir. 1967). Thin capitalization is *very strong evidence* of a capital contribution where "(1) the debt to equity ratio was high to start with, (2) the parties understood that it would likely go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations." United States v. Henderson, *supra* at 40.

At the time plaintiff became operative its debt-equity ratio was 160–1, clearly disproportionate. Shortly following the start of operations plaintiff borrowed $100,000, thus further unbalancing the debt to equity ratio. The need for such funds must have been obvious from the outset in view of the only $1000 paid-in capital. The property acquired for the debt was the only capital asset of the corporation; and the additional funds borrowed from the bank were used to reduce this indebtedness and for initial operating expenses. Thus, by reason of

thin capitalization alone, "very strong evidence" of a capital contribution is present.

Thin capitalization is of even more significance where combined with "subordination to other indebtedness." Rowan v. United States, *supra* 219 F.2d at 55. There is no evidence that the notes given to the stockholders were themselves directly subordinated to the bank's loans. However, it is highly significant that the individual stockholders did personally guarantee the bank's loan to the corporation. Such action may not constitute subordination in fact, but it definitely does in effect. Plaintiff's failure to meet its obligation to the bank when due would operate to make said stockholders liable for the obligation of plaintiff. Direct subordination of the stockholder notes would give the bank access at most to only the property standing as security for the stockholders' notes, said security being already subject to Warwick's first mortgage, but the personal guaranty gives the bank access to *all* the assets of the stockholders, including the notes and their security. Substantively, the guaranty more than subordinated the stockholders' notes.[2]

Also, another species of subordination is present here. As each lot was sold by plaintiff it was *released from the mortgages of both Warwick and the stockholders*. Notes generated from the sale of lots were assigned to the stockholders by the plaintiff. Periodically the stockholders would then "assign them to FIRST NATIONAL BANK as a pledge for one or more loans made by FIRST NATIONAL BANK to FLORIDA–GEORGIA CORPORATION." (Affidavit of Donald Schutt, page 2). Since the stockholders as creditors of plaintiff were to be repaid from the proceeds of the sale of lots by plaintiff and since the proceeds from these sales were pledged to the bank by the stockholders

2. When a lien-creditor subordinates his lien in favor of a junior lien-creditor he in effect says to the junior lien-creditor "You go first and I will wait"; when he unconditionally guarantees payment of the junior lien debt he in effect says, "Even if I should go first, I guarantee that you will not be harmed thereby."

as security for the loans made by the bank to plaintiff it is indisputable that this course of conduct resulted in a "piecemeal subordination" of the stockholder notes to the indebtedness of plaintiff to the bank, the extent of subordination increasing as each lot was sold. This course of conduct continued unabated during and after the tax years in question.

Closely related to "thin capitalization" and "subordination" is the fact of "pro rata" loans by the stockholders.[3] As was stated in Tyler v. Tomlinson, *supra*, 414 F.2d at 849:

> "Similarly the pro rata loans by shareholders indicate that the Tylers intended to put their money 'at the risk of the business,' (citations omitted) in order to support the equity that they had previously owned in partnership form. As long as the "debt" money is contributed pro rata, the equity benefit derived from the additional investment in debt form is no less than it would have been if all the shareholders had bought additional equity. Only the tax consequences are different.' * * * Courts are recognizing more and more that a loan proportionate to stock ownership becomes a form of *pari passu* equity. * * * The Tyler loan was thus the vehicle for the conversion of partnership equity into corporate equity."

The notes here in issue equal each stockholder's proportionate interest in the land transferred by the partnership to the corporation. (Each stockholder prior to transfer, in effect, possessed a one-fourth interest in the land. Each stockholder also possessed a one-fourth interest in the corporation.) Coupled with "thin capitalization" and subordination of interests as heretofore discussed, it is obvious that the loans were "thus the vehicle for the conversion of partnership equity into corporate equity." Tyler v. Tomlinson, *supra* at 849.

As previously noted, the resolution of debt equity problems involves a careful analysis of numerous criteria. Although the foregoing discussion convinces this court that the land transfer herein under consideration was in legal contemplation a contribution to corporate entity, we observe that certain additional tests as above noted for determining the nature of advances to closely held corporations are applicable to this case and weigh heavily against the creation of and indebtedness by the land transfer. The four creditor-stockholders were the sole stockholders and the only officers and directors. Realistically speaking, these four individuals "were the corporation." In effect, their interests as stockholders and as creditors were the same. Furthermore, although the notes were absolute in form, viewed from a practical standpoint, payment was contingent upon the success of the business. The parties contemplated payment only from the profits derived from the sale of lots from the tract of land conveyed to plaintiff, and as a practical matter, no other assets being possessed by plaintiff, no other funds were available with which to pay the notes according to their terms. Thus, in a very real sense, payment of the notes was contingent upon the success of the business. As pointed out in Curry v. United States, 396 F.2d 630, at 633 (5th Cir. 1968), "if repayment of an advance is contingent upon the success of the business, the advancement is usually considered a contribution to capital; * * *."

The transfer of the land to plaintiff was not an arm's length isolated transaction. Such transfer was not only "an integral part of the scheme of its forming and financing," United States v. Hertwig, 398 F.2d 452, 455 (5th Cir. 1968), but the land transferred was the primary asset of the corporation and its development represented the sole business purpose of plaintiff. The land in the case *sub judice* occupies the same

---

3. For the purposes of this case, there is no real distinction between an "outright" loan of money to the corporation creating a "debt" and the transfer of property to the corporation likewise creating a "debt" by such transfer.

position as the patents in *Hertwig, supra,* where the court said further on page 455:

"The patents were the primary asset of the new corporation. Their determined value of $3,000,000.00, and the notes of a like amount, contrasted with Precision's $10,000.00 capitalization preclude any finding but that Dennis and Mattox, as holders of the notes, had a continuing proprietary interest in the success of the venture. That Dennis and Mattox expected the notes would be paid does not alter this conclusion."

For these reasons we find the conclusion inescapable that the transfer of the 75 acre tract to plaintiff was in contemplation of Section 362 of the Internal Revenue Code a contribution to capital and did not result in the creation of an indebtedness. Accordingly, defendant's motion for summary judgment is herewith granted. Plaintiff is not entitled to a deduction for interest paid on the notes and acquires the same basis in the property as that of the partners.

Counsel for defendant will prepare an order in accordance herewith and present the same after affording counsel for plaintiff opportunity for suggestions as to form.