United States Court of Appeals
Fifth Circuit

**F I L E D**

September 16, 2002

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**

**FIFTH CIRCUIT**

——————————

No. 01-60932

(Summary Calendar)

——————————

BRAZORIA COUNTY STEWART FOOD MARKETS, INC,

Petitioner - Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

Appeal from a Decision of
the United States Tax Court
USTC No. 1037-99

Before JONES, SMITH and EMILIO M. GARZA, Circuit Judges.

PER CURIAM[*]:

Brazoria County Stewart Food Markets ("Brazoria") appeals the tax court's judgment holding

Brazoria liable for income tax deficiencies for the tax years 1991, 1992, and 1994. Brazoria raises

————————————————

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

two issues: (1) that the tax court erred in holding that advances it made to a related corporation represented capital contributions rather than debt and (2) that the tax court erred in finding that Brazoria conceded at trial that it was not entitled to an interest expense deduction, precluding it from asserting that theory in its post-trial brief.

Brazoria is a Texas corporation operating several grocery stores around Brazoria, Texas. Vernon Stewart is Brazoria's founder, CEO, and sole shareholder. Stewart, along with two other individuals, also formed another Texas corporation, Used Power Equipment (UPE). Each of the three shareholders of UPE owned one-third of the common stock. The shareholders' total aggregate capital contribution at UPE's start-up amounted to $1000. Brazoria maintained no ownership interest in UPE.

UPE's original business was the removal and sale of used machinery from industrial plants. In 1990, Stewart bought out UPE's other shareholders for a total of $75,000 and made himself president. Also in 1990, UPE decided to undertake what it characterized as a "short-term venture" in another area of business. UPE was awarded several contracts with Formosa Plastics Corporation to perform construction work related to the expansion of one of Formosa's plants. UPE lacked sufficient working capital to finance the work required at the plant prior to the receipt of progress payments from Formosa. Thus, in order to finance the construction work, Stewart directed Brazoria, his wholly owned company, to obtain three separate loans from a third-party lender, Grocers Supply Co. ("Grocers"). Brazoria then turned the money it received from Grocers over to UPE. Grocers advanced the loans to Brazoria with the knowledge that UPE would receive the proceeds. The loans from Grocers were secured by Brazoria's assets and personally guaranteed by Stewart. The total amount of the principal of these loans was $1,025,000.

In addition to the three loans advanced through Brazoria, UPE obtained a separate loan for $218,000 directly from Grocers which was personally guaranteed by Stewart and secured by a purchase money security interest in the equipment UPE purchased with the loan. All four loans bore interest rates of ten percent per year.

A dispute later arose between Formosa and UPE which led to UPE stopping work on the contracts. Formosa then terminated the contracts, and UPE sued for damages. Formosa settled out of court. UPE recovered a net amount of $227,114 from the settlement, which it transferred to Brazoria. At this point, UPE ceased operations. Brazoria determined that it could not recover anything more from UPE. It paid off the principal and interest remaining on its three loans from Grocers. Brazoria also paid off, out of its own funds, the $111,984.67 balance remaining on the loan made directly from Grocers to UPE.

On its 1994 tax return, Brazoria claimed a bad debt deduction of $1,352,433, representing interest and principal it was unable to recover from UPE plus the $111,984.67 it voluntarily paid on the loan made directly from Grocers to UPE. Brazoria then carried those losses back to its 1991 and 1992 tax years, resulting in net operating losses for those years. The Commissioner of Internal Revenue sent Brazoria a notice of deficiency disallowing the bad debt deduction and the resulting net operating loss deductions for 1991 and 1992. The notice stated that Brazoria had failed to show that the amounts deducted were bona fide bad debt and not contributions to capital.

Brazoria filed a petition with the tax court, contending that the advances to UPE were loans, not capital contributions. It argued in the alternative that, if the advances to UPE were not loans, it should be allowed to take an interest deduction for $463,559 in interest it paid to Grocers on the loans. At trial, the tax court held that Brazoria failed to prove that the advances to UPE were loans.

It also held that statements by Brazoria's counsel at trial conceded that the interest-deduction theory was not viable, thus precluding Brazoria from raising that theory in its post-trial briefs.

## I

We review the decision of the tax court under the same standards that apply to district court decisions. Thus, issues of law are reviewed de novo, and findings of fact are reviewed for clear error. *Park v. Comm'r*, 25 F.3d 1289, 1291 (5th Cir. 1994). The characterization of an advance as either a debt or a contribution to capital presents primarily a question of law. *Texas Farm Bureau v. United States*, 732 F.2d 437, 438 (5th Cir. 1984).

We must first decide whether the advances to UPE from Brazoria were genuine loans. 26 U.S.C. § 166(a)(1) provides that, in the case of a corporation, "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." Under Treasury Regulations, only "bona fide" bad debts qualify for the deduction. 26 C.F.R. 1.166-1(c) ("Only a bona fide debt qualifies for purposes of section 166."). Loans enjoy more favorable tax treatment than equity investments. *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1974). For example, the Internal Revenue Code imposes a tax on a shareholder's dividend income, yet does not allow the corporation to take a corresponding deduction. *Id.* In contrast, when loan principal payments are made, the lender assumes no additional tax liability. The lender must report interest as income, but the Code permits the paying corporation to deduct the interest payments. *Id.* Moreover, if the corporation fails, the shareholder can sometimes write off loans as bad debt under § 166, whereas capital contributions do not provide a corresponding deduction. As a result, shareholders of closely held corporations sometimes make small stock investments coupled with large "loans" of additional funds. *Id.* The IRS has sought to ensure that such "loans" really are genuine loans and not efforts to

disguise capital contributions in order to receive favorable tax treatment. *Id.* The same principle requires close scrutiny of alleged loans between affiliated closely held corporations. *Texas Farm Bureau*, 732 F.2d at 438.

Distinguishing true loans from capital contributions is difficult because debt and equity are not mutually exclusive categories. 14A WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 6970.39 (2000). Instead, "pure debt and pure equity lie at different ends of a spectrum with any number of variations in between." *Id.* Any given investment may have characteristics of both debt and equity. It is not surprising, therefore, that in this case the government emphasized certain characteristics of the Brazoria-UPE transaction which were equity-like, while Brazoria emphasized those characteristics which were debt-like. In *Estate of Mixon*, we developed a thirteen-factor analysis to help evaluate whether a given investment should be treated as debt or as a capital contribution. *See Estate of Mixon*, 464 F.2d at 402. The factors are: (1) the names given the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of the payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) subordination; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of dividend money; (11) the ability to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the corporation to repay on the due date. *See generally Estate of Mixon*, 464 F.2d at 403-10; *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 582 (5th Cir. 1977).

In considering these factors, we do not give all of them equal weight. The goal of the inquiry is not to "count factors, but to evaluate them." *Slappey Drive*, 561 F.2d at 581 (quoting *Tyler v.*

*Tomlinson*, 414 F.2d 844, 848 (5th Cir. 1969)).  Each case turns on its own facts and "different circumstances may bring different factors to the fore."  *Id.*

We now undertake to evaluate the *Mixon* factors as they apply to the facts found by the tax court in order to determine whether the advances were loans or capital contributions.

(1) The name given to the certificate.

In general, the issuance of a stock certificate indicates an equity investment, whereas the issuance of a bond, debenture, or promissory note indicates a debt investment.  However, we look beyond the title that the parties choose for the document.  Creating a debt requires more than making "corporate paper encrusted with the appropriate nomenclatural captions."  *Tyler*, 414 F.2d at 876.  Instead, the "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice."  *Estate of Mixon*, 464 F.2d at 403.

Here, the tax court found as a matter of fact that the "advances from petitioner to UPE were not contemporaneously memorialized in promissory notes."  Although Brazoria challenges this finding, we see nothing in the record to indicate clear error.  Normal business practice would generally require contemporaneous instruments recording a debt.  An advance by a corporate shareholder (or an affiliated corporation) "without terms of repayment, interest, and consideration would undoubtedly indicate that the advances were equity bound and intended."  *Estate of Mixon*, 464 F.2d at 403.

Brazoria did submit to the tax court copies of promissory notes.  These notes were prepared

for the purposes of litigation[1] and backdated. At trial, Stewart could not remember who prepared these backdated notes or under what circumstances. He also could not explain what happened to the alleged original notes. He thought that they might have been lost or perhaps destroyed in a fire at UPE's offices. Stewart testified that two of the reconstructed promissory notes had different interest rates than the corresponding original notes; the reconstructed notes had interest of ten percent instead of twelve percent. Here, the nonchalance with which Brazoria treated the promissory notes demonstrates the absence of arm's length business standards. In our view, an arm's length lender would have taken more care to safeguard the evidence of the indebtedness. It would not have entrusted the creditor with the only copies of the promissory notes, nor would it have been so cavalier about reducing interest rates.

Brazoria also never reported the advances to its accountants, did not record them on its books and records as loans, and failed to report any interest income on its federal income tax forms for the years in question. Overall, these facts indicate that the advances from Brazoria to UPE did not create anything resembling a business-like, arm's length creditor-debtor relationship. This first factor weighs heavily against Brazoria.

(2) Presence or absence of a fixed maturity date.

The presence of a fixed maturity date is a characteristic of a debt obligation, whereas the absence of a fixed maturity date indicates that "repayment was in some way tied to the fortunes of the business, indicative of an equity advance." *Id.* at 404. Again, the tax court here found that no promissory notes were prepared contemporaneously with the advances. At least until the promissory

---

[1]Presumably, the notes were prepared for the litigation against Formosa, not the litigation against the IRS.

notes were prepared, UPE was under no fixed obligation to repay the advances to Brazoria.

The promissory notes were prepared for the purposes of litigation against Formosa, after the Formosa contract had fallen through. By this time, it was already apparent that UPE would have difficulty repaying the loans. The creation of a backdated promissory note with a fixed maturity date, after it had become apparent that UPE could not repay the advances, does little to advance Brazoria's cause. This factor also weighs against classifying the advances as loans.

(3) The source of the payments.

In general, a lender expects to be paid regardless of whether the creditor's business does well or poorly. If repayment is possible only out of corporate earnings, the transaction is more likely to be an equity contribution. If repayment does not depend on earnings, but instead could be satisfied out of a companies's assets or capital, the transaction appears more like a loan to the corporation. *Id.* at 405, *see also Slappey Drive Indus. Park*, 561 F.2d at 581 ("Generally, shareholders place their money 'at the risk of the business' while lenders seek a more reliable return." (internal citations omitted)).

The record indicates that Brazoria's advances were at the risk of UPE's business. Unlike Grocers' loans to Brazoria, the advances from Brazoria to UPE were not secured by any of UPE's assets. Brazoria claimed that UPE had a valuable inventory of salvaged industrial equipment from which it could satisfy the debts, but the tax court found that Brazoria's estimates of the value of this equipment were not credible. Brazoria claims that it expected repayment out of the progress payments made to UPE on the Formosa contracts. But, although UPE received almost $8 million in progress payments from Formosa, it was still unable to repay the debts. Moreover, UPE's inventory of industrial equipment, purportedly worth millions, was ultimately sold locally for scrap.

On balance, this factor also weighs against characterizing the advances as loans.

### (4) Right to enforce repayment.

The right to enforce repayment is evidence of a definite obligation to repay, and therefore a debt investment. The absence of the right to enforce repayment indicates an equity investment. *Estate of Mixon*, 464 F.2d at 405. Here, again, Brazoria and UPE did not execute any contemporaneous promissory notes that would have given Brazoria a right to demand repayment. Nor is there any other evidence in the record of a definite obligation to repay the advances, at least until the backdated notes were created. By that time, again, the prospects of any kind of repayment looked dim. This factor also weighs against Brazoria.

### (5) Participation increase in management.

One of the advances included $75,000 earmarked for buying back the other two investors' shares in UPE. As a result of the stock buy-back, Stewart's ownership of UPE increased to 100%. Moreover, after he obtained 100% ownership, Stewart installed himself as president of UPE. This factor weighs heavily against classifying the advances as loans.

### (6) Subordination.

The tax court found as a fact that "petitioner's advances were purposefully and systematically subordinated in favor of . . . other creditors." We see nothing in the record that would indicate that this finding was clearly erroneous. Brazoria points out that UPE was also not able to pay other creditors, especially Grocers, in full. It also points out that UPE did make some payments to Brazoria. Neither of these facts undermines the tax court's finding that on balance the purported debts to Brazoria were systematically given less priority than those to other creditors. This factor weighs slightly in favor of treating the advances as loans.

(7) Intent of the parties.

In *Estate of Mixon*, we explained that the subjective intent of the parties might be relevant if the objective factors are ambiguous. *Id.* at 407. The tax court made no specific findings as to the subjective intent of the parties. In this case, no finding as to subjective intent was required because the objective factors are not ambiguous. *See id.* (holding that a "*subjective* intent on the part of an actor will not alter the relationship or duties created by an otherwise objectively indicated intent."). Moreover, the evidence on this point is ambiguous. Although some checks from Brazoria to UPE bore the notation "Loan to UPE," Brazoria did not report the advances to its accountants as loans and did not treat them as loans on its federal income tax returns. We conclude that this factor does not weigh on either side of the scale.

(8) Thin or adequate capitalization.

The tax court found as a matter of fact that UPE was thinly capitalized. UPE had only $1000 worth of paid-in capital and well over $1 million in loans. Brazoria, however, contends that this factor should not be given much importance because (1) there was no evidence that the parties expected the debt-equity ratio to increase and (2) because the advances were not used to buy capital assets or commence operations. In *Estate of Mixon*, we recognized the "insignificance" of the thin capitalization factor in the absence of these two circumstances. *Id.* at 408. The government failed to identify any evidence that the parties expected the debt-equity ratio to increase. The tax court made no specific fact finding on this point. In light of *Estate of Mixon*, we therefore do not place much weight on the thin capitalization of UPE. This factor weighs only slightly against Brazoria.

(9) Identity of interest between creditor and stockholder.

If stockholders advance funds to a corporation in proportion to their equity interests, then the

-10-

advances reflect equity rather than debt investment.[2]  In *Estate of Mixon*, the taxpayer contributed 80% of an alleged loan, but owned only 15.3% of the corporation's stock.  *Id.* at 409.  We held that the "sharply disproportionate ratio between [the] stockholder's percentage interest in stock and debt" indicated that the debt was bona fide.  *Id.*  An equity investor would ordinarily expect a return proportionate to his investment.

Here, Brazoria advanced some funds before Stewart became 100% owner of UPE, but the majority of funds were advanced after Stewart became sole owner.  Ordinarily, this would indicate that the loans made before Stewart became full owner were debt and not equity investment and vice versa.  However, the tax court explained that each of the other two original owners of UPE contributed something at the start-up of the corporation besides capital.  Vernor, one of the other original shareholders, was a demolition expert who had been awarded a salvage contract by Dow Chemical Corporation.  Vernor contributed this contract to UPE.  The contract provided UPE with an initial supply of salvaged equipment.  Busch, the third original shareholder, was familiar with the salvaged equipment.  He was charged with cataloging the equipment and finding buyers for it on the international market.  Stewart's responsibility, in contrast, was simply to provide capital to the corporation.  Given that the other two initial owners contributed valuable non-monetary assets to the corporation, it was not inconsistent with an equity investment for Stewart to make a larger initial monetary contribution.  Moreover, as noted above, many of the advances took place after Stewart became sole owner.  We therefore find that this factor weighs against Brazoria.

(10) Payment of interest only out of dividend money.

---

[2]Although Brazoria was not itself a shareholder of UPE, affiliate company transactions are accorded the same kind of scrutiny as shareholder transactions. *Texas Farm Bureau v. United States*, 732 F.2d 437, 438 (5th Cir. 1984).

The *Mixon* court, in considering this factor, explained that the "failure to insist on interest payments ordinarily indicates that the payors are not seriously expecting any substantial interest income, but are interested primarily in the future earnings of the corporation." *Id.* at 409. It went on to insist that "a true lender is concerned with interest." *Id.*

Here, Brazoria obtained a secured loan from Grocers at a ten percent interest rate and "loaned" it to UPE on an unsecured basis at an identical ten percent interest rate. Although it was at least theoretically possible for Brazoria to make money on this scheme, the transaction hardly evidences the concern for interest payments that we would normally expect in an arm's length creditor-debtor relationship. Indeed, Brazoria itself explains the purposes of the loans at least in part as part of an effort to "build a relationship with UPE and . . . position that company to be a source of financial assistance in the future." The focus on UPE's future success rather than on making a profit from the interest on the loan weighs heavily in favor of considering these advances equity and not debt.

(11) Ability to obtain loans from outside lending institutions.

The ability of a corporation to borrow funds from outside sources at the time that an advance is made gives the transaction "the appearance of a bona fide indebtedness." *Estate of Mixon*, 464 F.2d at 410. Here, UPE obtained some outside loans. It obtained one loan directly from Grocers, which was secured by a purchase money security interest in the equipment purchased with the loan. There is also at least some evidence that it secured another loan from the First State Bank of Sweeney.

But the real purpose of this factor is to determine "whether the shareholder contributor acted in the same manner toward their corporation as ordinary reasonable creditors would have acted."

-12-

The one loan from Grocers was secured, whereas Brazoria's advances were all unsecured. And there is little evidence in the record as to the terms of the Sweeney loan. Although UPE may have been able to obtain one or two loans from outside sources, Brazoria has not shown that it has dealt with UPE on the same terms as outside "ordinary reasonable creditors."

(12) The extent to which the advance was used to acquire capital assets.

The tax court found that UPE used the advances in part to acquire capital assets, including equipment needed to perform the Formosa contracts. Moreover, the tax court found that initial 1987 advances from Brazoria were used in part to acquire capital assets. Brazoria now challenges these findings as clearly erroneous.

The record provides sufficient support for the tax court's findings. Brazoria stipulated that $318,000 of the advances was intended for the purchase of equipment, and Stewart himself testified that some of the initial advance money was used to acquire capital assets. This factor weighs in favor of considering the loans as equity.

(12) The failure of the corporation to repay on the due date.

Although UPE paid some money to Brazoria, it is undisputed that it failed to pay a large portion of the advances on their purported due dates, leading Brazoria to take the bad debt deductions at issue here.


All of the relevant factors here indicate that the advances were capital contributions and not genuine loans. Brazoria did not deal with UPE as an ordinary, arm's length creditor would. As such, we agree with the tax court that Brazoria was not entitled to take a bad debt deduction for the unpaid advances.

-13-

## II

Brazoria claimed, in an amendment to its petition with the tax court, that, if it was not entitled to a bad debt deduction, it was nevertheless entitled to deduct $463,559 interest paid to Grocers on the loans. At trial, one of Brazoria's accountants, Anderson, acknowledged that this figure was incorrect. Anderson relied on numbers obtained from Brazoria and UPE in arriving at the $463,559 figure. After discussing the interest payments with Grocers directly, she adjusted the figure to $228,560.13.

After Anderson's testimony, the following exchange took place among the attorneys and the tax court:

> The Court: All right. And Mr. Cummings, is the Respondent going to offer any witnesses?
>
> Mr. Cummings (for the Commissioner): No, Your Honor. And I was thinking that we might be able to keep Mr. Nelson's appearance very short, because I think now – *I don't think we now have a disagreement about the figures.* Since Ms. Anderson testified, I think the *Petitioner would agree that the $463,000 alternative position is not valid and that the figures she relied upon came from Grocers.* And they're in the exhibits, and I don't know that we have a dispute about that anymore.
>
> The Court: What about that Mr. Grimsinger?
>
> Mr. Grimsinger (for Brazoria): *I will agree that the $463,559 theory is not something that the Petitioner is currently relying on.* I believe that I communicated that to Respondent in discussions prior to this case. I'm sorry that we had to hash it out in the courtroom.

The tax court held that Mr. Grimsinger's statement amounted to an admission that Brazoria was not entitled to *any* interest deduction. Brazoria contends, however, that it admitted only that the $463,000 figure was wrong.

Only "'deliberate, clear and unequivocal' statements can constitute conclusive judicial admissions." *In re Corland Co.*, 967 F.2d 1069, 1074 (5th Cir. 1992). We review the tax court's

-14-

finding that a litigant conceded an issue at trial for clear error. *See Sealy Power, Ltd. v. Comm'r*, 46 F.2d 382, 398 (5th Cir. 1995).

Here, we conclude that Grimslinger's statement cannot be construed as a "deliberate, clear and unequivocal" statement that he wished to waive the entire interest deduction argument. In context, it appears that Grimslinger was agreeing with Cummings's statement that "I don't think we now have a disagreement about the *figures*." At the very least, Grimslinger's statement was ambiguous. As such, the tax court clearly erred in concluding that it constituted a concession of the interest deduction argument.

We therefore VACATE the tax court's conclusion as to the interest deduction theory. The Commissioner contends that there is insufficient evidence that interest payments to Grocers were in fact made, and that the amounts claimed to have been paid were actually consolidated into a new loan. The Commissioner is free to urge these arguments on the merits to the tax court on remand.

AFFIRMED IN PART, VACATED IN PART, and REMANDED for further proceedings not inconsistent with this opinion.