T.C. Memo. 2000-108


UNITED STATES TAX COURT


VICTOR I. ROSENBERG AND DEBORAH I. ROSENBERG,
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8299-98.                    Filed March 29, 2000.


Martin Aaron Schainbaum and David B. Porter, for petitioners.

Howard J. Schneck and Maria T. Stabile, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge: Respondent determined that petitioners have deficiencies in income tax and additions to tax as follows:

| Year | Deficiency | Addition to tax Sec. 6651 |
|------|------------|---------------------------|
| 1989 | $67,419 | $17,586 |
| 1990 | 16,501 | 7,409 |
| 1991 | 16,765 | 6,947 |
| 1992 | 14,961 | None |

Petitioners formed Cabana Boy Productions, Inc. (Cabana Boy), a subchapter C corporation. Cabana Boy tried unsuccessfully to produce a movie. Petitioners contend that they advanced to or paid on behalf of Cabana Boy $2,111,701.20 (the advances or claimed advances).[1]

Following concessions, the issues for decision are:

1. Whether petitioners' advances to Cabana Boy were loans, as petitioners contend, or equity, as respondent contends. We hold that they were equity and therefore are not deductible as bad debts under section 166.

2. Whether petitioners may disregard Cabana Boy's C corporation status and deduct the advances as if Cabana Boy had been organized as an S corporation and used the advances to pay ordinary and necessary expenses. We hold that they may not.

3. Whether petitioners' advances to Cabana Boy were made to produce or collect income or for the management, conservation, or maintenance of property held to produce income and are thus deductible under section 212. We hold that they are not.

---

[1] Respondent contends that petitioners did not advance or pay that amount to or on behalf of Cabana Boy. Based on our resolution of the issues in dispute, we need not decide whether the amount petitioners claim is correct.

4.    Whether petitioners' advances to Cabana Boy were made to promote Dr. Rosenberg's medical practice and thus are deductible by petitioners as advertising or promotional expenses. We hold that they are not.

Section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

A.    Petitioners

Petitioners Victor I. Rosenberg (Dr. Rosenberg) and Deborah I. Rosenberg (Mrs. Rosenberg) lived in New York, New York, when they filed the petition.  Dr. Rosenberg has been a plastic surgeon since 1970.  Petitioners' residence and Dr. Rosenberg's medical practice were located at the same address in New York during the years in issue.  Almost all of Dr. Rosenberg's income was from his medical practice.  Mrs. Rosenberg worked in Dr. Rosenberg's medical office until 1986.

Before and during the years in issue, Dr. Rosenberg continuously sought publicity for his plastic surgery practice in periodicals and on television.  He advertised in New York. Before 1986, articles about plastic surgery that mentioned or featured Dr. Rosenberg appeared in the New York Daily News, the New York Times, the New York Post, Lifestyles, the National Enquirer, Vogue, Cosmopolitan, Bazaar, Every Woman, Prime Time,

Self, US, Hairdo & Beauty, and Show Business.  Dr. Rosenberg spoke about plastic surgery in three appearances on the television show "Live With Regis" in 1987.  He also appeared on the television shows "Live With Regis and Kathie Lee", the "Oprah Winfrey Show", and "Donahue".  These appearances brought Dr. Rosenberg many new patients.  Dr. Rosenberg listed these articles and appearances in his curriculum vitae.

B.   Cabana Boy

1.   Beginning of the Cabana Boy Project

In 1985, petitioners stayed at the Beverly Hills Hotel in Beverly Hills, California, while Dr. Rosenberg attended a medical convention.  Ashley Tyler (Tyler) and Jeffrey Kinart (Kinart) worked as cabana boys at the hotel swimming pool where they met petitioners.  Tyler wanted to make a movie from the novel, Neuromancer, by William Gibson (Gibson).  Mrs. Rosenberg read the novel and became excited about the idea of making a movie based on it.  Tyler visited petitioners in New York at the end of 1985 and moved to New York to live with petitioners early in 1986.

2.   Incorporation of Cabana Boy

On dates not stated in the record, petitioners consulted their attorney, Richard Fabricant (Fabricant), and their accountant, Arnold Hyman (Hyman) (petitioners' advisers), about the Cabana Boy project.  Mrs. Rosenberg attended the

meetings regarding Cabana Boy's formation. Dr. Rosenberg did not attend those meetings.

Petitioners' advisers recommended that petitioners form a corporation for the Cabana Boy project. Fabricant filed the Cabana Boy certificate of incorporation in New York on January 27, 1986, which established Cabana Boy as a subchapter C corporation with a purpose of making feature motion pictures.

Mrs. Rosenberg was president and treasurer of Cabana Boy. Tyler was executive vice president and secretary. Kinart was vice president for creative development. Dr. Rosenberg was not an officer of Cabana Boy. In February 1986, Cabana Boy paid Gibson $100,000 for the movie, television, and allied rights in the Neuromancer novel. Mrs. Rosenberg signed the agreement for Cabana Boy.

### 3. The Shareholders' Agreement

On March 29, 1986, petitioners, Tyler, and Kinart (the shareholders) and Cabana Boy signed a shareholders agreement. Mrs. Rosenberg signed the shareholders agreement for Cabana Boy. In the shareholders agreement: (a) Cabana Boy agreed to issue 49 shares to Tyler, 49 shares to Kinart, and 100 shares to petitioners; (b) Mrs. Rosenberg agreed to assign to Cabana Boy the motion picture and other rights to the Neuromancer novel as consideration for the issuance of petitioners' stock; and (c) Tyler and Kinart each agreed to pay $10 per share (i.e., $490

each) to Cabana Boy for their shares of Cabana Boy stock and to work full time for Cabana Boy.  Cabana Boy issued shares as follows:  100 to petitioners on March 29, 1986, 49 to Tyler on June 25, 1986, 24.5 to petitioners on July 10, 1986, and 24.5 to Tyler on July 10, 1986.

An unsigned promissory note (sample note) is attached to the Cabana Boy shareholders' agreement.  The note has the word "sample" written on the front and on the Cabana Boy signature block.  The sample note said that $100,000 was payable by Cabana Boy to petitioners on demand.

4.  <u>Operation of Cabana Boy</u>

Cabana Boy operated primarily from petitioners' residence, but also had offices in New York, California, and at Shepperton Studios in London.  Beginning in 1986, Mrs. Rosenberg worked full time for Cabana Boy.  Mrs. Rosenberg, Tyler, and Kinart (until July 1986) managed Cabana Boy.  Mrs. Rosenberg hoped to produce more movies after they completed the Neuromancer movie.

In 1986, Cabana Boy had a separate checking account.  Dr. Rosenberg began to transfer money to the Cabana Boy checking account in 1986.  Dr. Rosenberg did not sign any loan agreements between himself and Cabana Boy.  Petitioners did not ask for or receive interest on any of the money they advanced to Cabana Boy.

Cabana Boy hired entertainment lawyer Howard Singer (Singer) to negotiate and draft contracts. Cabana Boy also hired entertainment lawyer Jerry Simon Chasen (Chasen).

Hyman was Cabana Boy's certified public accountant from 1986 to 1991 or 1992. Hyman created books for Cabana Boy that were separate from the books for Dr. Rosenberg's medical practice and accounted separately for Cabana Boy and Dr. Rosenberg's medical practice. Petitioners and their assistant (Nancy Barret) or Viewpoint Management Co. kept the books and records for Cabana Boy. Petitioners gave information to Hyman to prepare financial statements and tax returns. Hyman used that information to prepare financial statements.

5.  Cabana Boy Publicity

On July 7, 1986, Cabana Boy retained a public relations firm. Articles about Cabana Boy appeared in periodicals including the Hollywood Reporter, L.A. Weekly, Newsweek, People, the Wall Street Journal, the New York Times, the Village Voice, Rolling Stone, Screen International, Science Fiction Chronicle, and Variety. Some of the articles published about Cabana Boy and the Neuromancer project mentioned Dr. Rosenberg. However, Dr. Rosenberg did not list Cabana Boy articles in his curriculum vitae, and he did not advertise his medical practice in California.

C.    The Neuromancer Movie Project

Mrs. Rosenberg and Tyler began to write the screenplay for the Neuromancer movie in 1986.  On November 26, 1986, Cabana Boy hired a producer and a production designer.

The Neuromancer movie was planned to include many special effects.  At its Shepperton Studios office, Cabana Boy prepared storyboards showing key scenes and costume designs, and sketches showing special effects and makeup.  Mrs. Rosenberg frequently traveled between New York, London, and California to work on the Cabana Boy project.

On August 4, 1988, Chasen sent the Neuromancer screenplay to the U.S. Copyright Office for registration on behalf of Cabana Boy.

D.    Kinart's and Tyler's Departure

In July 1986, Cabana Boy and its shareholders met and removed Kinart as an officer and director of Cabana Boy.  Cabana Boy agreed to pay Kinart 1 percent of the net profits from the distribution and exhibition of any film based on the book Neuromancer or a related production.

Tyler stopped working for Cabana Boy at the end of 1987 and resigned as an officer and director on February 18, 1988.  Mrs. Rosenberg continued to work on the Neuromancer project after Tyler left.

E.    The Tri-Star Pictures Agreement

On June 2, 1989, Cabana Boy, Tri-Star Pictures, Inc. (Tri-Star), and petitioners signed an agreement (1) for petitioners to develop the Neuromancer screenplay into a feature length motion picture; (2) for Tri-Star, at its discretion, to produce the movie; and (3) for petitioners to be credited as producers of the movie on screen and in paid advertisements.

F.    Financing Cabana Boy

In October 1986, Cabana Boy formed a New York limited partnership named Neuromancer Partners to raise funds for the Neuromancer project.  Singer drafted a private placement memorandum for Neuromancer Partners.

On August 26, 1987, Cabana Boy hired a consultant named Ron Joy (Joy) to obtain financing.  Joy was not successful.

On September 22, 1987, Cabana Boy borrowed $750,000 from R.G. Capital Corp. (R.G. Capital), which was due on September 22, 1988.  Petitioners personally guaranteed repayment of the loan.

In November 1987, Cabana Boy formed a Delaware limited partnership named Neuromancer Partners, L.P. to raise funds for the Neuromancer project.  Cabana Boy was the general partner for Neuromancer Partners, L.P.

On February 24, 1988, Cabana Boy paid William H. Blair (Blair) $10,000 to obtain financing for Cabana Boy within 120 days.  Cabana Boy also agreed to pay Blair an amount equal to 3

percent of the financing Blair obtained and 10 percent of Cabana Boy's profits from the Neuromancer project.

On September 27, 1988, Mrs. Rosenberg (individually), Cabana Boy, Keith Cavele (a London producer), and Motion Picture Finance Company Ltd. (a London firm) borrowed $50,000 from Warren Harris (Harris) for the Neuromancer project. The loan agreement provided that Harris would receive repayment with 25 percent interest and 2.5 percent of any profits from the film.

On October 19, 1988, Fabricant obtained about $2.2 million by mortgaging petitioners' residence. Petitioners used the proceeds to pay a previous mortgage of about $1 million and to finance Cabana Boy.

G.    Cabana Boy Financial Statements

Hyman prepared unaudited financial statements for Cabana Boy's taxable years ending November 30, 1987 and 1988, from information provided by management. In the financial statements, Hyman treated the payments that petitioners made to or on behalf of Cabana Boy as loans. Hyman did not express any opinion as to the accuracy of the information provided by Cabana Boy when he prepared the Cabana Boy financial statements. The financial statements indicated that Cabana Boy owed petitioners $137,102 on November 30, 1987, and $953,505 on November 30, 1988. Hyman also reported the following on Cabana Boy's 1987 and 1988 financial statements:

| Year | Liabilities | Equity |
|------|-------------|--------|
| 1987 | $887,937 | ($204,556) |
| 1988 | 954,758 | (315,821) |

## H.   Tax Returns

On its 1986 return, Cabana Boy reported that loans from shareholders were $391,045 at the beginning of 1986 and $137,102 at the end of 1986.  Hyman prepared Cabana Boy's Forms 1120, U.S. Corporation Income Tax Returns, for its taxable years ending November 30, 1987 through 1990.  On June 22, 1995, Mrs. Rosenberg signed Cabana Boy's corporate tax returns as president. Petitioners did not treat their advances to Cabana Boy as loans or claim bad debt deductions on their individual income tax returns.

## I.   Dissolution of Cabana Boy

Cabana Boy was dissolved on March 24, 1993.  Petitioners never demanded repayment of any money spent on the Cabana Boy project.

### OPINION

Petitioners offer several alternative theories to support the deduction of their advances to Cabana Boy:  (A) The advances were debt, not equity; (B) their advances to Cabana Boy were business expenses of Cabana Boy which petitioners may deduct as if Cabana Boy were an S corporation, or they were Cabana Boy's alter ego; (C) petitioners may deduct the advances under section 212 as expenses to produce income; and (D) petitioners may deduct

the advances as advertising or promotional expenses of Dr.
Rosenberg's plastic surgery practice.

A.    Whether Petitioners' Advances to Cabana Boy Were Debt or
      Equity

Petitioners contend that their advances to Cabana Boy were
loans that became worthless in the years in issue.  Respondent
contends that the claimed advances were equity.

A taxpayer may deduct a bona fide debt that becomes
worthless in the taxable year.  See sec. 166(a)(1).  Taxpayers
generally bear the burden of proving that the transfers by the
taxpayers to the corporations were loans and not equity.  See
Rule 142(a); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476,
493 (1980).  The question of whether a transfer of funds to a
closely held corporation is debt or equity must be decided based
on all the relevant facts and circumstances.  We consider various
factors in deciding whether a loan is bona fide.  See Estate of
Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).  No
single factor controls.  See John Kelley Co. v. Commissioner, 326
U.S. 521, 530 (1946); Fin Hay Realty Co. v. United States, 398
F.2d 694, 697 (3d Cir. 1968).  We next apply these factors to
this case.

1.    Name Given to the Certificate Evidencing the Transfer
      of Funds

The issuance of a stock certificate in exchange for an
advance suggests that the advance is equity, and the issuance of

a bond or note suggests that it is debt. See Estate of Mixon v. United States, supra at 403. Cabana Boy issued stock certificates to petitioners as consideration for the motion picture rights. However, there are no signed notes or loan agreements relating to the remaining $2,011,701.20 in advances petitioners claim to have made. Tyler testified that there were loan documents, but none were offered into evidence. Petitioners contend that they intended their advances to be governed by the terms of the sample note. We disagree. We do not consider the sample note because it was unsigned. This factor is neutral.

2. Interest Payments

Making an advance without charging interest suggests that the advance is not a loan. See National Carbide Corp. v. Commissioner, 336 U.S. 422, 435 n.16 (1949); Estate of Mixon v. United States, supra at 409. There is no evidence that petitioners charged or received interest from Cabana Boy. This factor favors respondent.

3. Fixed Maturity Date or Repayment Schedule

The absence of a fixed maturity date or repayment schedule suggests that advances are equity. See Estate of Mixon v. United States, supra at 404; American Offshore, Inc. v. Commissioner, 97 T.C. 579, 602 (1991). Petitioners contend that the repayments were to be made on demand because the unsigned sample note so stated. We disagree. We are not convinced that the sample note

applies to the claimed advances, and there is no evidence that Cabana Boy had to repay petitioners at any time.  This factor favors respondent.

4.    Collateral or Other Security

The absence of any requirement for collateral or other security suggests that advances are equity.  See Slappey Drive Ind. Park v. United States, 561 F.2d 572, 580 n.11 (5th Cir. 1977); Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963).  There is no evidence that petitioners required Cabana Boy to provide collateral or any other security.  This factor favors respondent.

5.    Treatment of Advances in Books and Records

Treatment of advances as debt in books and records suggests that the advances are loans.  See Tyler v. Tomlinson, 414 F.2d 844, 850 (5th Cir. 1969); American Offshore, Inc. v. Commissioner, supra at 604.  Hyman treated some of the advances as debt on Cabana Boy's financial statements and tax returns. This factor favors petitioners.

6.    Repayments

The making of repayments suggests that advances were loans. See Tyler v. Tomlinson, supra; American Offshore, Inc. v. Commissioner, supra at 603.  There is no evidence that Cabana Boy made any repayments to petitioners.

Petitioners point out that the balance sheets on Cabana Boy's tax returns show that shareholder loans decreased by $253,943 from the beginning to the end of 1986 and contend that this shows that Cabana Boy repaid that amount in 1986. We disagree. Tax returns do not establish the truth of the facts stated therein. See Lawinger v. Commissioner, 103 T.C. 428, 438 (1994); Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). This factor favors respondent.

7.    Thin Capitalization

Thin capitalization (i.e., a high ratio of debt to equity) generally suggests that an advance to a closely held corporation is a capital contribution. See Hardman v. United States, 827 F.2d 1409, 1414 (9th Cir. 1987); Electronic Modules Corp. v. United States, 695 F.2d 1367, 1370 (Fed. Cir. 1982); Estate of Mixon v. United States, supra at 408. Thin capitalization is a significant factor because it reflects the extent to which creditors are shielded against business losses and declines in property values. See Hardman v. United States, supra.

Cabana Boy's 1987 and 1988 unaudited financial statements show the following:

| Year | Liabilities | Equity |
|------|-------------|--------------|
| 1987 | $887,937 | ($204,556) |
| 1988 | 954,758 | (315,821) |

Cabana Boy's debt-to-equity ratios for 1987 and 1988 were extremely high because shareholders' equity was negative.[2]  See Dunmire v. Commissioner, T.C. Memo. 1981-372; Steiner v. Commissioner, T.C. Memo. 1981-212, affd. without published opinion 688 F.2d 825 (3d Cir. 1982).

Petitioners contend that the debt-to-equity computations should not include the $750,000 loan from R.G. Capital which petitioners guaranteed and repaid.  However, excluding the $750,000 would not change our analysis because reducing Cabana Boy's liability by $750,000 does not change the fact that shareholders' equity was negative in 1987, and thus the debt-to-equity ratio was very high.  This factor favors respondent.

8.   Third Party Loans

If the party receiving an advance can borrow funds in an arm's-length transaction on similar terms, the advances may appear to be debt.  See Electronic Modules Corp. v. United States, supra at 1370; Estate of Mixon v. United States, supra at 410.  Cabana Boy borrowed $750,000 from R.G. Capital in 1987.  Petitioners personally guaranteed the loan.  The loan document is not in evidence.  Petitioners have not shown that the terms of the R.G. Capital loan are like the terms of their advances.

---

[2]  A meaningful debt-to-equity ratio cannot be computed for 1987 and 1988 because the owners have negative equity in those years.  See Dunmire v. Commissioner, T.C. Memo. 1981-372.

Petitioners contend that Cabana Boy borrowed $2.2 million from Crossland Mortgage Corp. We disagree. That loan was to petitioners.

Petitioners point out that Cabana Boy borrowed $50,000 from Harris. However, the terms of that loan differ from the terms of the advances because Cabana Boy had three coborrowers and Harris wanted to be paid a high interest rate and also receive a percentage of the profits from the movie. This factor favors respondent.

9. Use of Funds

Using cash advances to finance initial business operations such as daily operating expenses may suggest that the advances were equity. See Slappey Drive Ind. Park v. United States, supra at 583; Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712, 722 (5th Cir. 1972). Cabana Boy used $100,000 of the advances to acquire the rights to Neuromancer. Cabana Boy used the remainder of the funds at issue to pay for all of its operations including daily expenses. This factor favors respondent.

10. Source of Repayments

Advances are more likely to be equity if the only source of funds for repayment is corporate earnings. See Electronic Modules Corp. v. United States, supra at 1372; Estate of Mixon v. United States, supra at 405. Petitioners contend that Cabana Boy did not need corporate earnings to repay the advances because it

could get loans or other financing from third parties. Petitioners did not show that anyone else was willing to advance funds to Cabana Boy. Cabana Boy had little success obtaining financing from third parties. This factor favors respondent.

11. Subordination

Subordination of repayment of an advance to other indebtedness suggests that the advance is equity. See Estate of Mixon v. United States, supra at 406; United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967). Petitioners point out that there is no evidence that there were any subordination agreements. However, even if there were no subordination agreements, timely payment by the alleged debtor to other creditors while not repaying advances effectively subordinates the advances to the rights of the other creditors who receive payment in the interim. See American Offshore, Inc. v. Commissioner, 97 T.C. at 603; Inductotherm Indus., Inc. v. Commissioner, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985). Cabana Boy paid its creditors, but it never repaid petitioners and petitioners never asked to be repaid. Thus, petitioners effectively subordinated their advances to those of other corporate creditors. This factor favors respondent.

12. Increased Management Participation

If making an advance increases an individual's right to participate in the management of the entity which received it, then that person may be participating as a shareholder rather than as a creditor. See Estate of Mixon v. United States, supra at 406; United States v. Henderson, supra. Mrs. Rosenberg participated in Cabana Boy's management because petitioners owned 63 percent of the stock. This factor is neutral.

13. Advances Proportionate to Stock Ownership

If advances by shareholders are proportionate to their stock ownership, an equity contribution is indicated. See Estate of Mixon v. United States, supra at 409; American Offshore, Inc. v. Commissioner, supra at 604. Petitioners owned 63 percent of the stock and provided all of the advances. Thus, while petitioners were the controlling shareholders, the advances were not proportionate. This factor is neutral.

14. Right To Enforce Repayment

A taxpayer's right to enforce repayment of an advance suggests that the advance is a loan. See Estate of Mixon v. United States, supra at 405; American Offshore, Inc. v. Commissioner, supra at 603. There is no evidence that petitioners had any right to enforce repayment of the claimed advances. Petitioners contend that they had a right to enforce repayment because Dr. Rosenberg could call the loans on demand.

We disagree.  The demand feature appears on the unsigned sample note.  This factor favors respondent.

15.  Taxpayers' Intent

The taxpayer's statement of intent is relevant if the objective facts are ambiguous.  See Estate of Mixon v. United States, 464 F.2d at 407; Tyler v. Tomlinson, 414 F.2d at 850; American Offshore, Inc. v. Commissioner, supra at 604.  The objective facts show that the advances were equity.  Thus, this factor does not apply.

16.  Conclusion

We conclude that petitioners' advances were equity and not debt.[3]  Thus, petitioners may not deduct the advances as bad debts under section 166 for the years in issue.

B.  Whether Petitioners May Disregard Cabana Boy's Subchapter C Status and Deduct Their Advances

Petitioners point out that expenses for Cabana Boy and petitioner's medical practice were both paid from the medical practice checking account, and that both activities were located in petitioners' home.  Petitioners contend that they may treat Cabana Boy as if it were an S corporation.  We disagree.  Cabana Boy was a C corporation.  There is no evidence that petitioners intended Cabana Boy to elect S status.  Even if they had wanted

---

[3]  In light of our conclusion, we need not decide whether the debts were business debts or whether and when they became worthless.

Cabana Boy to be an S corporation, those intentions would be irrelevant because what matters is what petitioners did. See <u>Don E. Williams Co. v. Commissioner</u>, 429 U.S. 569, 579-580 (1977); <u>Commissioner v. National Alfalfa Dehydrating & Milling Co.</u>, 417 U.S. 134, 148-149 (1974).

Citing <u>Arrowsmith v. Commissioner</u>, 344 U.S. 6 (1952), petitioners contend that they may disregard Cabana Boy's subchapter C status because they were Cabana Boy's alter ego. We disagree. In <u>Arrowsmith v. Commissioner</u>, <u>supra</u>, two taxpayers liquidated their corporation and reported a capital gain. See <u>id.</u> at 7. Later, the taxpayers paid a judgment against the corporation, and deducted the judgment as an ordinary business expense on their personal income tax returns. The U.S. Supreme Court held that the judgment was a capital expense. See <u>id.</u> at 9. <u>Arrowsmith</u> does not establish that Cabana Boy should not be treated as a C corporation.

Cabana Boy had a business purpose and assets, did business, entered into contracts, and had officers. It was a subchapter C corporation, separate from petitioners, and petitioners treated it as such. We conclude that petitioners may not disregard Cabana Boy's subchapter C status.

C. <u>Whether Petitioners May Deduct the Advances Under Section 212</u>

Petitioners contend that they may deduct the advances under section 212. We disagree. A taxpayer may deduct ordinary and

necessary expenses for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. See sec. 212(a). However, a taxpayer may not deduct a contribution of capital to a corporation under section 212. See Conant v. Commissioner, T.C. Memo. 1986-415. Petitioners may not deduct the claimed advances under section 212 because they were contributions to the capital of Cabana Boy.

D.   Whether Petitioners May Deduct the Advances as Advertising or Promotional Expenses for Dr. Rosenberg's Plastic Surgery Practice

Petitioners contend that they may deduct the advances as advertising or promotional expenses for Dr. Rosenberg's plastic surgery practice under section 162 because they paid those amounts to attract patients for Dr. Rosenberg from the motion picture industry.[4]  Dr. Rosenberg testified that he paid the advances to publicize his medical practice. Dr. Rosenberg's testimony is not consistent with the objective evidence. In his curriculum vitae, he listed the articles and television shows in which he appeared, but he did not mention Cabana Boy or any Cabana Boy publicity. None of the articles in the exhibit

---

[4]  Petitioners contend that they may deduct their advances under sec. 162 because Dr. Rosenberg made the advances to protect his credit worthiness or business reputation. We disagree. Dr. Rosenberg did not so testify. In any event, petitioners have not shown how paying the claimed advances would protect his credit or reputation.

containing Dr. Rosenberg's publicity mention Cabana Boy or the movie "Neuromancer". There are no documents in evidence that suggest that Dr. Rosenberg's plastic surgery practice had anything substantial to do with Cabana Boy except to provide a source of funds. Seven of the 27 articles in the record publicizing Cabana Boy mention Dr. Rosenberg. Those that do describe him as Mrs. Rosenberg's husband or part of the family that Tyler and Kinart met at the pool. Only five articles describe Dr. Rosenberg as a New York plastic or cosmetic surgeon.[5] Dr. Rosenberg's only other apparent advertising benefit from Cabana Boy was that he appeared as a guest on "Live With Regis".

Tyler testified that he wrote a letter to Cabana Boy's public relations firm to request it to publicize Dr. Rosenberg; however, the letter on which he relied did not include that instruction.

We conclude that petitioners did not pay the advances to Cabana Boy to attract patients for Dr. Rosenberg from the motion

---

[5] This is so even though Tyler testified that the content of most of the articles had been provided to the publications by Cabana Boy's public relations firm.

picture industry.

To reflect the foregoing and concessions of the parties,[6]

Decision will be entered

under Rule 155.

_____

[6] Respondent determined and contends that petitioners did not have a cost of goods sold of $150,000 in 1989.  Petitioners did not address this issue on brief.  We deem petitioners to have conceded this issue.  See Burbage v. Commissioner, 82 T.C. 546, 547 n.2 (1984), affd. 774 F.2d 644 (4th Cir. 1985); Wolf v. Commissioner, T.C. Memo. 1992-432, affd. 13 F.3d 189 (6th Cir. 1993).